# 24-1279

---

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

SHEILA A. BOYETTE AND TIFFANY JIMINEZ,
individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

MONTEFIORE MEDICAL CENTER, THE BOARD OF TRUSTEES OF
MONTEFIORE MEDICAL CENTER, THE TDA PLAN COMMITTEE, and
DR. MICHAEL STOCKER, *Defendants-Appellees*
and John Does 1-30, *Defendants*

---

**Appeal from the United States District Court for the
Southern District of New York**

---

**BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS**

---

Mark K. Gyandoh
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax: (717) 233-4103

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Second Circuit Local Appellate Rule 26.1, Appellants, Sheila A. Boyette and Tiffany Jiminez, make the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*Not applicable.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*Not applicable.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the

case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated: July 8, 2024                    */s/ Mark K. Gyandoh* _____

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

JURISDICTIONAL STATEMENT ...........................................................1

A. District Court's Subject Matter Jurisdiction....................................1

B. Court of Appeals' Jurisdiction.........................................................1

C. Timeliness of Appeal.......................................................................1

D. Final Judgment................................................................................1

STATEMENT OF THE ISSUE...............................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ..............................2

STATEMENT OF THE CASE.................................................................2

I. Procedural History.................................................................................3

II. Statement of Facts .................................................................................4

A. Overview of the the Plan......................................................4

B. Recordkeeping Details and Evidence of Fiduciary Conduct are Solely in Defendants' Possession..........................................5

C. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Partitipants .......................................8

D. Circumstantial Evidence Plausibly Shows that the Plan's Fiduciaries Failed to Follow a Prudent Process to Evaluate Plan Fees...........................................................................11

i.. The Consequences of Using an Asset-Based Fee Structure Demonstrates Defendants' Deficient Fiduciary Processes .......11

ii. Form 5500s Filings and other Sources Reliably Indicate the Unreasonableness of the Plan's RKA Fees..............................13

iii. There is Circunstantial Evidence of Defendants' Deficient Monitoring processes and Excessive Fees Paid by the Plan ....15

iv. The Fidelity Stipulation ...........................................................17

SUMMARY OF THE ARGUMENT .......................................................18

STANDARD OF REVIEW ....................................................................20

ARGUMENT .......................................................................................24

I. Defendants Breached Their Fiduciary Duties In Failing To Monitor the Plan's RKA Fees......................................................................25

A. The District Court Erred In Denying Plaintiffs' Motion to File an Amended Complaint By Applying An Improper Standard Of Review Under a Rule 12(b)(6) Motion to Dismiss to the Proposed Third Amended Complaint........................................................25

B. The District Erred In Failing To Consider the TAC's Robust Circumstantial Evidence that Defendants Breached Their Fiduciary Duties............................................................................27

C. The Court Improperly Viewed Facts and Alternative Theories in a Light Most Favorable to Defendants....................................33

D. The Distict Court Erred in Dismissing Plaintiffs' TAC Purportedly Because the Plaintiffs Did Not Plead Similar Enough Comparators ..35

a. The Court Applied a Heightened Pleading Standard in Reviewing the Comparability of Recordkeeping Services.......35

b. The Court Applied a Heightened Pleading Standard in Reviewing the Comparability of Plan Size................................39

iv

E.     The District Court Ignored Second Circuit Precedent ........................41

II.    The Third Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor ........................................................................45

CONCLUSION .........................................................................................45

SPECIAL APPENDIX

Memorandum Opinion and Order
Dkt. 69, Apr. 5, 2024 ...........................................................................SA1

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Acito v. Imcera Group, Inc.*,
47 F.3d 47 (2d Cir. 1995)........................................................................20

*Aetna Cas. and Sur. v. Aniero Concrete*,
404 F.3d 566 (2d Cir. 2005).....................................................................21

*Ashcroft v. Iqbal*,
556 U.S. 662 (129 S.Ct. 2009)................................................... 23, 24, 26

*Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)............................................................................ 22, 23

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)..................................................................................23

*Boyette, et al., v. Montefiore, et al.*
2024 WL 1484115 (S.D.N.Y.  Nov. 13, 2023)................................*Passim*

*Braden v. Walmart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ..........................................................*Passim*

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*,
No. 21 CIV. 8384 (KPF), 2024 WL 2815980 (S.D.N.Y. May 31, 2024) .. 24, 26, 32

*Carrigan v. Xerox Corp.*
No. 3:21-CV-1085 (SVN), 2022 WL 1137230 (D. Conn. Apr. 18, 2022)....... 32, 36

*Dionicio v. U.S. Bancorp*,
No. 23-CV-0026 (PJS/DLM),
2024 WL 1216519 (D. Minn. Mar. 21, 2024), *motion to certify appeal denied*,
No. 23-CV-0026 (PJS/DLM), 2024 WL 2830693 (D. Minn. June 4, 2024).... 28, 36

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982).....................................................................19

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir.1983), *cert. denied sub nom.,*

*Falberg v. Goldman Sachs Grp., Inc.*,
No. 19 CIV. 9910 (ER), 2020 WL 3893285 (S.D.N.Y. July 9, 2020) ............ 24, 33

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
No. 17-cv-6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ............................42

*Garthwait v. Eversource Energy Co.*,
No. 3:20-CV-00902 (JCH), 2022 WL 3019633 (D. Conn. July 29, 2022) .............28

*Gedek v. Perez*,
66 F. Supp. 3d 368 (W.D.N.Y. 2014) ....................................................................22

*Gonzalez v. Northwell Health*,
No. 20-cv-3256, 2022 WL 4639673 (E.D.N.Y. Sep. 30, 2022) .............................43

*Hughes v. Northwestern Univ.*
63 F.4th 615 (7th Cir. 2023) ("*Hughes II*") .......................................................*Passim*

*Lanka v. O'Higgins*,
810 F. Supp. 379 (N.D.N.Y. 1992) .......................................................................22

*Matney v. Barrick Gold of N. Am.*,
80 F.4th 1136 (10th Cir. 2023) .................................................................. 31, 43, 44

*Mator* v. Wesco Distribution, Inc.,
No. 22-2552, __F.4th__,
2024 WL 2198120 (3d Cir. May 16, 2024*)* ....................................................*Passim*

*Mazzola v. Donovan*,
464 U.S. 1040, (1984) ..........................................................................................22

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ...............................................................................42

*Moitoso et al. v. FMR, et al.*,
451 F.Supp.3d 189 (D.Mass. 2020) ......................................................................17

*Moreno v. Deutsche Bank Americas Holding Corp.*,
No. 15 CIV. 9936 (LGS), 2016 WL 5957307 (S.D.N.Y. Oct. 13, 2016)......... 23, 45

*In re M&T Bank Corp. ERISA Litig.*,
No. 16-CV-375 FPG, 2018 WL 4334807 (W.D.N.Y. Sept. 11, 2018) ..................36

*In re Omnicom ERISA Litig.*,
No. 20-CV-4141 (CM), 2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021)....... 27, 32, 37

*Palin v. New York Times Co.*,
940 F.3d 804 (2d Cir. 2019)....................................................................21

*Pension Ben Guar. Corp. ex rel. St. Vincent Catholic Medical Ctrs. Ret. Plan v. Morgan Stanley Investment Management*,
712 F.3d 705 (2nd Cir. 2013) .................................................... 22, 26

*Perkins v. United Surgical Partners Int'l Inc.*,
No. 23-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024).................20, 30, 31, 36

*Pfeil v. State St. Bank & Trust Co.*,
806 F.3d 377 (6th Cir. 2015) ..................................................................22

*Rotblut v. 333 E. 66th St. Corp.*,
1996 WL 586353 (S.D.N.Y.).................................................................21

*Ruilova v. Yale-New Haven Hosp., Inc.*,
No. 3:22-CV-00111-MPS, 2023 WL 2301962 (D. Conn. Mar. 1, 2023) ..............31

*Sacerdote et al. v. New York Univ.*,
9 F.4th 95 (2d Cir. 2021),
cert. denied, 142 S. Ct. 1112 (2022) .............................................*Passim*

*Singh v. Deloitte LLP*,
650 F. Supp. 3d 259 (S.D.N.Y. 2023) ....................................................41

*Smith v. CommonSpirit Health*,
37 F.4th 1160 (6th Cir. 2022) ...............................................................31

*Sweda v. Univ. of Pa.*,
923 F.3d 320 (3d Cir. 2019)....................................................... 21, 24, 25

*Troudt v. Oracle Corp.*,
No. 16-CV-00175-REB-SKC, 2019 WL 1006019 (D. Colo. Mar. 1, 2019)...........28

*Vellali v. Yale Univ.*,
308 F. Supp. 3d 673 (D. Conn. 2018)................................................... 32, 36, 42, 43

**Statutes**

28 U.S.C. § 1331 ....................................................................................1

29 U.S.C. § 1001 ....................................................................................1

29 U.S.C. § 1104(a)(1)(A) ....................................................................19

29 U.S.C. § 1104(a)(1)(B) ..................................................................2, 19

29 U.S.C. § 1291 ....................................................................................1

29 U.S.C. § 1332(e)(1)............................................................................1

Fed. R. Civ. Pro. 12(b)(6) ........................................................... 20, 21, 25

**Other Sources**

401k Averages Book 20th Edition..........................................................43

Employee Retirement Income Security Act of 1974...........................................1, 2

## JURISDICTIONAL STATEMENT

### A. District Court's Subject-Matter Jurisdiction

The district court had subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

### B. Court of Appeals' Jurisdiction

This Court has jurisdiction over this appeal pursuant to 29 U.S.C. § 1291 because the district court's Memorandum Opinion and Order denying Plaintiffs' Motion to File a Third Amended Complaint and directing the case be closed be closed is a final judgment of the district court.

### C. Timeliness of Appeal

The district court's Memorandum Opinion and Order was issued on April 5, 2024. APP13. Plaintiffs filed the Notice of Appeal on May 3, 2024. APP340.

### D. Final Judgment

This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF THE ISSUE

Whether the District Court erred in determining Plaintiffs Sheila A. Boyette and Tiffay Jiminez's (collectively "Plaintiffs") proposed Third Amended Complaint ("TAC") failed to adequately plead plausible claims for breach of ERISA's fiduciary

duties for failing to adequately monitor the Montefiore Medical Center 403(b) Plan's ("Plan") recordkeeping fees which resulted in excessive recordkeeping fees at the expense of the Plan's participants.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case has not been before this Court previously.

## STATEMENT OF THE CASE

This case concerns the failure of Defendant-Appellees[1] each of whom served as a Plan fiduciary, to protect the interests of the Plan, its participants, and their beneficiaries in violation of Defendants' fiduciary obligations under ERISA. ERISA's duty of prudence requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Defendant-fiduciaries breached their duty of prudence by failing to adequately monitor and control the Plan's recordkeeping fees which resulted in the Plan and participants paying excessive fees and losing out on compounding returns.

---

[1] "Defendant-Appellees" or "Defendants" refers to Montefiore Medical Center ("Montefiore"), The Board of Trustees of Montefiore Medical Center ("Board"), The TDA Plan Committee ("Committee"), Dr. Michael Stocker, and John Does 1-30.

## I.    Procedural History

Plaintiffs filed their original Complaint on June 22, 2022.  APP30.  On October 31, 2022, the Parties filed a Letter Request to Judge Koeltl with a Proposed Stipulation for Acceptance of Service, wherein Plaintiffs would file an Amended Complaint and Defendants would answer or otherwise respond by December 16, 2022.  The Court approved the Stipulation for Acceptance of Service of Complaint on October 31, 2022.  Accordingly, Plaintiffs filed a First Amended Class Action Complaint on November 14, 2022, APP73.  On December 16, 2022, Defendants filed a Letter Request to Judge Koeltl requesting a pre-motion conference on their proposed motion to dismiss.  The pre-motion conference was held via telephone on January 10, 2023, following which, the District Court issued an Order permitting Plaintiffs to file an amended complaint by February 24, 2023, and Defendants to answer or move to dismiss the amended complaint by March 31, 2023.

After being granted an extension request, on March 10, 2023, Plaintiffs filed their Second Amended Class Action Complaint, APP117.  On April 21, 2023, Defendants filed their Motion To Dismiss The Second Amended Complaint Pursuant To Federal Rules Of Civil Procedure 12(b)(1) and 12(b)(6), And Memorandum Of Law In Support Of Defendants' Motion To Dismiss The Second Amended Complaint.  APP164 and APP167.  On May 19, 2023, Plaintiffs filed their

Opposition to Defendants' Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint. APP196. Defendants filed their Reply on June 5, 2023. While the Motion to Dismiss the Second Amended Complaint was pending, Plaintiffs filed four notices of supplemental authority and Defendants filed two notices of supplemental authority. On November 13, 2023, the District Court granted Defendant's motion to dismiss the Second Amended Complaint without prejudice. APP227.

On December 14, 2023, Plaintiffs filed a Motion for Leave to File a Third Amended Complaint. APP251. On January 22, 2024, Defendants filed their Opposition to Plaintiffs' Motion for Leave to File a Third Amended Complaint. APP251. On February 12, 2024, Plaintiffs filed their Reply. APP326. Plaintiffs subsequently filed a notice of supplemental authority in support of their position. On April 5, 2024, the District Court denied Plaintiffs' Motion for Leave to File a Third Amended Complaint and ordered the case closed. APP13, *Boyette v. Montefiore Med. Ctr.*, No. 22-CV-5280 (JGK), 2024 WL 1484115 (S.D.N.Y. Apr. 5, 2024).

## II. Statement of Facts

### a. Overview of the Plan

At all times during the putative Class Period (June 22, 2016, through the date of judgment), Montefiore Medical Center 403(b) Plan (the "Plan") had at least $2

billion dollars in assets under management. APP287 (TAC ¶ 101).[2] At the end of

fiscal year 2020, the Plan had over $3.4 billion dollars in assets under management

that were/are entrusted to the care of the Plan's fiduciaries. *Id.* As of 2020, the Plan

had over 22,000 participants with account balances. APP291 (TAC ¶ 104). As

determined from the Service and Expense Agreement between Principal Financial

Group and Montefiore Medical Center (effective January 1, 2003), and later the

Recordkeeping and Related Services Agreement between Fidelity Workplace

Solutions and Montefiore Medical Center (effective January 2, 2018), the Plan

continuously received the industry standard suit of recordkeeping services for a Plan

of its size. APP276-77 (TAC ¶¶ 63-65) (citing nearly identical lists of services in

each agreement). The Plan's size and standard recordkeeping services meant that it

should have been able to garner some of the most competitive fees in the

marketplace.

> **b. Recordkeeping Details and Evidence of Fiduciary Conduct are Solely in Defendants' Possession.**

The amount of total recordkeeping fees paid by 401(k) and 403(b) plans are

not public information, nor is the information regarding their specific recordkeeping

services public. Recordkeepers issue 408(b)(2) disclosures to plan sponsors and

fiduciaries. These disclosures delineate the exact amounts plans pay to

---

[2] Plaintiffs cite to their Third Amended Complaint ("TAC").

recordkeepers but are not filed publicly and are not otherwise available to plan participants. APP274 (TAC ¶ 58). As a result, plaintiffs challenging the prudence exercised by plan fiduciaries must rely on circumstantial evidence at the pleading stage.

The same is true for Plaintiffs and this Plan, as well as the real-world comparator plans listed in the TAC, as Plaintiffs do not have access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries. APP279-80 (TAC ¶ 74). Other information which is within the sole possession of Plan sponsors and not made available to plan participants has also not been made available to Plaintiffs, such as meeting minutes and documentation of fiduciary reviews. APP281-82 (TAC ¶¶ 79-82). In an attempt to discover the details of the Plan's mismanagement, on December 17, 2020, Plaintiffs wrote to Montefiore requesting, *inter alia*, meeting minutes from the Committee. APP281 (TAC ¶ 79). By letter dated January 12, 2021, Montefiore denied Plaintiffs' request for these meeting minutes. *Id.*

Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. *Id*. But in most cases, even that is not sufficient. *Id.* For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of

prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote et al. v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021), cert. denied, 142 S. Ct. 1112 (2022) (emphasis in original).

In short, Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Walmart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer."). APP281-82 (TAC ¶ 81).

However, Plaintiffs were given access to the Plan's recordkeeping agreements in effect during the Class Period. A review of these agreements revealed that the Plan's recordkeepers, Principal in 2016-2017, and later Fidelity, were not providing any services beyond the standard services detailed in subsection B, *infra*. APP276-77 (TAC ¶¶ 63-65). Additionally, for purposes of the TAC, Plaintiffs have drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiffs, such as Rule 404a disclosures, Form 5500s filed with the

Department of Labor ("DOL"), and other authority. The Form 5500 is publicly accessible and provides general Plan information such as a plan's number of participants, assets under management, the type of defined contribution plan, how much was paid to third-party services, and other general compliance information.[3] Form 5500s are a reliable source for discerning Plan and comparator plan fees. APP282 (TAC ¶ 82). Defendants' breaches of their fiduciary duties in the course of their overall decision-making resulted in, *inter alia*, the imposition of excessive administrative and record-keeping fees which wasted the assets of the Plan and the assets of participants. APP282 (TAC ¶ 83).

### c. Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA. APP275 (TAC ¶ 60). Nearly all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost, particularly recordkeepers of large plans such as the Plan. APP275 (TAC ¶ 61). Numerous recordkeepers in the

---

[3] *See* https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500. Last Accessed June 27, 2024.

marketplace are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan. *Id*. Although the 403(b) and 401(k) participant servicing may fluctuate in terms of the finer details of each service, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and variations of participant servicing the employer has elected for his/her plan. APP278 (TAC ¶ 70).

There are essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan), which include, amongst other items, basic account recordkeeping (*e.g.* demographic, source, investment and vesting records); participant and plan sponsor access (*e.g.* phone, web); Daily participant transaction accounting; Payroll service (*e.g.* hardships, in-service withdrawals, termination distributions); tax reporting services, Participant confirmations, statements, and standard notices; Plan-level reporting; Participant education (*e.g.* newsletters, web articles, standard communication materials); and Plan consulting (*e.g.*, preapproved document services, operational materials). APP275-76 (TAC ¶ 62). These services are offered by all recordkeepers for one total price (typically at a per capita or "per person" price point), regardless of the details of the plan's services. APP276 (TAC ¶ 63).

Many of these services are plan-wide services, thus allocating the costs amongst a larger participant group will lower the amount per participant. APP278 (TAC ¶ 69). Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis, rather than based on the amount of assets under management in each plan. *Id.*[4] Ancillary services such as QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services. APP277 (TAC ¶ 65). The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services. APP277 (TAC ¶ 66). In brief, plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant RKA fee. APP279 (TAC ¶ 73); *see also* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").[5] Accordingly, a plan sponsor or fiduciary has

---

[4] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/

[5] *See* www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf (last accessed June 20, 2024).

the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.  APP278 (TAC ¶ 70).

### d. Circumstantial Evidence Plausibly Shows that the Plan's Fiduciaries Failed to Follow a Prudent Process to Evaluate Plan Fees

#### i. The Consequences of Using an Asset-Based Fee Structure Demonstrates Defendants' Deficient Fiduciary Processes

Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).  APP283-84 (TAC ¶ 89).  Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services.  *Id*.  Here, the Plan used an asset-based charge with revenue sharing to pay for the cost.  *Id*.  In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.  APP285 (TAC ¶ 92).  When a plan's investments are paid using an asset-based revenue sharing fee structure, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.  *Id.*

The problem with utilizing an asset-based charge with a plan as large as the Plan is that it's very difficult to control the average cost per participant, which is the industry gauge for evaluating the reasonableness of fees against peer groups. APP285-86 (TAC ¶ 95). Likewise, an asset-based structure means increases in costs are not due to any changes in services.

As demonstrated in the charts below, using an asset-based fee resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market RKA fees based on the amount of assets in the plan, not on services or prevailing market rates. APP285 (TAC ¶ 93). The Plan's RKA fees calculated on a per-participant basis were as follows:

| Year | A Assets | B Asset Based Fee | C Assets x Asset RK Fee | D Amount reported on 5500 as Paid to Recordkeeper[13] | E Partici-pants | F Average Cost Per Participant[14] |
|------|----------|-------------------|-------------------------|-------------------------------------------------------|-----------------|------------------------------------|
| 2016 | $1,568,403,861 | .00073 | $1,144,934 | $1,018,035 | 23,285 | $43 |
| 2017 | $2,666,343,904 | .00073 | $1,946,431 | $1,105,400 | 23,868 | $46 |
| 2018 | $2,583,737,604 | .00037 | $955,982 | $832,609 | 24,285 | $34 |
| 2019 | $3,096,416,585 | .00037 | $1,145,674 | $1,208,673 | 25,030 | $45 |
| 2020 | $3,462,065,613 | .00037 | $1,280,964 | $1,760,308 | 22,892 | $56 |
| 2021 | $3,942,303,782 | .00037 | $1,443,852 | $1,521,183 | 22,958 | $63 |
| 2022 | $3,285,911,024 | .00029 | $952,914 | $1,148,465 | 22,900 | $41 |

APP285-86 (TAC ¶ 95). The above chart demonstrates that amounts paid to the recordkeeper can increase while the asset-based fee remains the same. For example, as the assets in the Plan increased from 2016 to 2017 so did the average cost per participant. APP286 (TAC ¶ 96). From 2018 to 2021, the fees chronically increased while the asset-based fee remained the same. *Id.* There is no obvious explanation for why the Plan fiduciaries would elect to continue with an asset-based charge in

2018, when information available at the time showed that an increase in assets would increase the fees paid to the recordkeeper without any benefits to the Plan. Once the assets in the Plan increased, so did the average RKA fee per participant culminating in $63 per participant on average, which was more than double what the Plan should have been paying based on size, services, and the marketplace generally. *Id.*

In short, it is critical to closely monitor the actual RKA fees paid to a recordkeeper and select only prudent fee structures. Had Defendants followed their fiduciary duties, they would have investigated, discovered, and implemented the readily available per-person fee structure for the Plan.

### ii. Form 5500s Filings and other Sources Reliably Indicate the Unreasonableness of the Plan's RKA Fees

Other objective evidence points to the unreasonableness of the Plan's fees. Looking at recordkeeping costs for plans of a similar size in 2021 shows that the Plan was paying higher RKA fees than its peers. The chart below analyzes plans having more than 15,000 participants, some of whom also used Fidelity:

| Plan Name | Number of Participants | Assets Under Management | R&A Costs on Per-Participant Basis[15] | Record-keeper |
|---|---|---|---|---|
| Fedex Office and Print Services, Inc. 401(k) Retirement Savings Plan | 17,652 | $770,290,165 | **$30** | Vanguard |
| JBS 401(k) Savings Plan | 19,420 | $374,330,167 | **$25** | Great-West |
| Deseret 401(k) Plan | 34,357 | $3,381,868,127 | **$25** | Great-West |
| Publicis Benefits Connection 401K Plan | 42,316 | $2,547,763,175 | **$28** | Fidelity |
| Kaiser Permanente Supplemental Savings and Retirement Plan | 47,358 | $3,103,524321 | **$27** | Vanguard |
| Thermo Fisher Scientific Inc. 401(k) Retirement Plan | 51,325 | $7,716,754,000 | **$14** | T.Rowe Price |
| The Cargill Partnership Plan | 41,766 | $8,714,511,791 | **$19** | Vanguard |
| General Dynamics Corporation 401(k) Plan 6.0 | 48,852 | $9,868,037,206 | **$31** | Fidelity |

APP287-88 (TAC ¶ 102). Plans smaller than the Plan, meaning plans with less barraging power, paid less in fees – including plans also using Fidelity. The TAC includes another chart of comparator plans' data spanning from 2013-2019 demonstrating Defendants' failure to leverage the plan's size for lower fees. APP289-90 (TAC ¶ 103) (listing 17 plans).

Importantly, the comparator plans in the TAC's two charts were not only chosen for their size, but also their service codes. In order to keep this comparator analysis consistent with the Montefiore Plan, RKA costs are derived from Schedule C of the Department of Labor Form 5500s and reflect fees paid to each plan's recordkeeper. APP288 (TAC ¶ 102 n.15). Using this methodology excludes

revenue sharing which ensures that the fees analyzed are solely RKA fees. Coding in the industry does not have perfectly consistent methodology, so reliance on coding alone is not perfectly accurate, however, service codes are still adequately informative for discerning which plans are comparable when evaluating services rendered. *Id*. For example, some plan 5500s will simply use code 64 for recordkeeping while others will elect to add nearly twelve other codes in an abundance of caution. Nonetheless, these differing codes indicate payments for essential recordkeeping services that are comparable to the Plan. *Id*.

The Plan, with over 22,000 participants and over $3.4 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost anywhere in the mid-$20 range per participant from the beginning of the Class Period to the present. Smaller plans were paying an outlier amount of $35 to $36, therefore the Plan with its significant number of participants, should have been paying much less than $35 to $36 per participant for RKA fees. APP291 (TAC ¶ 104).

### iii. There is Circumstantial Evidence of Defendants' Deficient Monitoring processes and Excessive Fees Paid by the Plan

As noted above, recordkeepers' 408(b)(2) disclosures are not available to plan participants. By the same token, recordkeepers' 408(b)(2) disclosures to *other* 401(k) plans are not available to Plan fiduciaries. Thus, Plan fiduciaries are not privy to the fees paid by other 401(k) plans to their recordkeepers. Accordingly, the

best way for a Plan fiduciary (as opposed to a plan participant) to determine whether a plan is paying reasonable RKA fees is to conduct a request for proposal ("RFP") from competing recordkeepers. APP282 (TAC ¶ 84).

Fidelity served as the Plan's recordkeeper from 2018 to the present and Prudential served as the Recordkeeper during 2016 and 2017. APP282 (TAC ¶¶ 85). In 2020, Fidelity was the industry's largest recordkeeper measured by total assets receiving its recordkeeping services and Principal was ranked as the 5th largest. *Id*. At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP to any recordkeeper including any of the recordkeepers listed in the top ten who were peers of Fidelity and Principal and were capable of providing lower RKA fees for the same caliber of services, as will be explained below. APP283 (TAC ¶ 86). The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive recordkeeping service provider arena. APP283 (TAC ¶ 87).

As mentioned, large plans can and often do negotiate, for lower per participant RKA fees. APP277, APP292 (TAC ¶¶ 67, 108). Conducting negotiations and RFPs are part of the standard of care and diligence carried out by fiduciaries responsible for similarly situated plans. It is apparent that no RFPs, negotiations, or other proactive measures were conducted by Defendants here, because the amounts paid for recordkeeping were outrageous, and the Plan experienced increasing amounts in

RKA fees while the asset-based fee percentage, services, and recordkeeper remained the same. APP283 (TAC ¶ 88).

### iv. The Fidelity Stipulation

In *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020), Fidelity, the Plan's recordkeeper, was a party to a class action lawsuit involving Fidelity's multi-billion-dollar plan with tens of thousands of participants - like the Plan. In *Moitoso,* the "parties [] stipulated that if Fidelity were a third party negotiating this fee structure at arms-length, the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper." *Moitoso et al. v. FMR, et al.*, 451 F.Supp.3d 189, 214 (D.Mass. 2020). APP291 (TAC ¶ 106). Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that **Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year.** Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. **The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).**

> *Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

Poignantly, the Fidelity Stipulation states that $21 is the *highest* negotiated fee for a plan with the same recordkeeper, similar demographics, and same value of services, during a significantly overlapping time period as the instant Plan's circumstances. APP292 (TAC ¶¶ 108) (the instant Class Period began on June 22, 2016). This stipulation, alongside the Fidelity serviced plans listed in the TAC's charts, show that at least eight similarly situated plans paid lower RKA fees to the same recordkeeper, as well as the 17 other plans paying less in fees to recordkeepers in Fidelity's peer group.

In sum, the Plan maintained a tremendous size while receiving ordinary recordkeeping services at a time when the marketplace for recordkeeping services was competitive, and fees were generally declining. Had Defendants adhered to the standard of prudence employed by similarly situated fiduciaries, the Plan, and thousands of Plan participants, would not have incurred losses in the form of excessive fees and diminished compounding returns.

## SUMMARY OF THE ARGUMENT

Plaintiffs brought this action on behalf of the Plan, and current and former employees of Montefiore Medical Center ("Montefiore"), who during the putative Class Period (June 22, 2016, through the date of judgment), participated in the Plan, which is governed by ERISA.

Under ERISA, fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a similarly situated plan. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). A subset of the duty of prudence is the duty to ensure cost-conscious management of plan investments, including the costs of third parties servicing a plan. Accordingly, Defendants were required to ensure that the Plan and participants only paid reasonable compensation for RKA services provided to the Plan. Here, Defendants breached their fiduciary duties by subjecting the Plan and its participants to unjustifiably high RKA fees.

Courts employ a "holistic evaluation of an ERISA complaint's factual allegations", to determine whether the facts, construed most favorably to Plaintiffs, "support a plausible inference" of imprudence. *Sacerdote*, 9 F.4th at 109n.49. The TAC alleges robust circumstantial facts supporting a plausible claim for excessive recordkeeping costs. In fact, the TAC pleads even more detail than other complaints upheld under Second Circuit standards and circuit courts around the country. Despite Plaintiffs' well-pled allegations, the District Court dismissed Plaintiffs' TAC.

The holding of the District Court should be reversed because it was based on several legal errors. The District Court applied an improper heightened standard of

review for a Rule 12(b)(6) motion to dismiss. The District Court did not "construe [the TAC] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote*, 9 F.4th at 106; *see also Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Rather, the District Court viewed the facts most favorably in Defendants favor, failed to apply a holistic approach, and ignored Second Circuit precedent. Finally, the District Court erred in holding that Plaintiffs failed to adequately plead "with specificity what services provided by the recordkeepers", when Plaintiff did sufficiently plead the relativity of services in accord with to the pleading standards of the Second Circuit and circuit courts throughout the country. *See e.g.*, *Mator v. Wesco Distribution Inc.*, No. 22-2552, 2024 WL 2198120 (3d Cir. May 16, 2024); *Hughes v. Northwestern Univ.* 63 F.4th 615 (7th Cir. 2023) ("*Hughes II*"); *Perkins v. United Surgical Partners Int'l Inc.*, No. 23-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024).

Therefore, the District Court erred in finding that Plaintiffs' proposed TAC would be futile under a 12(b)(6) standard, and this Court should reverse the District Court's decision granting Defendants-Appellees' motion to dismiss and remand this case to the District Court for further proceedings on the merits.

## STANDARD OF REVIEW

"Leave to amend should be freely granted." *Acito v. Imcera Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995). Courts may deny leave to amend based on futility of the

proposed amended complaint. *Id*. "'In addressing the proposed futility of an amendment, the proper inquiry is comparable to that required upon a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).'" *Aetna Cas. and Sur. v. Aniero Concrete*, 404 F.3d 566, 604 (2d Cir. 2005) (quoting *Rotblut v. 333 E. 66th St. Corp.,* 1996 WL 586353, *1 (S.D.N.Y.)). "That is, the court must accept the facts alleged by the party seeking to amend as true and construe them in the light most favorable to that party." *Id.* The Second Circuit exercises plenary review of a district court's order granting a Rule 12(b)(6) motion to dismiss a complaint. *Palin*, 940 F.3d at 809.

When considering a motion to dismiss under Rule 12(b)(6), a court takes the factual allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiffs. *Sacerdote*, 9 F.4th at 106. It is undisputed that Plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. Accordingly, the Court must employ a "holistic approach" to evaluate an ERISA complaint. *Sacerdote*, at FN 49 (citing *Sweda v. Univ. of Pa.*, 923 F.3d 320, 331 (3d Cir. 2019); *Braden*, 588 at 598). Put differently, courts recognize that in cases alleging imprudent fiduciary process, "a claim for a breach of fiduciary duty under ERISA may survive a motion to dismiss—even absent any well-pleaded factual allegations relating directly to the methods employed by the ERISA fiduciary—if the complaint alleges facts that, if proved, would show that an adequate investigation would have

revealed to a reasonable fiduciary that the investment at issue was improvident."

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc*., 712 F.3d 705, 718

(2d Cir. 2013).

Critically, the Supreme Court has held that ERISA does not grant fiduciaries

a "defense-friendly standard", meaning there is no "presumption of prudence" when

ruling on a motion to dismiss. *Bancorp v. Dudenhoeffer*, 573 U.S. 409, 412 (2014)

(internal citations omitted). *See also Gedek v. Perez*, 66 F. Supp. 3d 368, 376

(W.D.N.Y. 2014) (holding that what *Dudenhoeffer* " does make clear, though, is that

(1) there is no presumption that a fiduciary acted prudently, regardless of the type of

fund at issue…"); *Pfeil v. State St. Bank & Trust Co.*, 806 F.3d 377, 381 (6th Cir.

2015) ("The Supreme Court granted the petition and, reversing our judgment,

abrogated the 'presumption of prudence' doctrine altogether. *Dudenhoeffer,* 134

S.Ct. at 2467"); *Lanka v. O'Higgins*, 810 F. Supp. 379, 387 (N.D.N.Y. 1992) ("It is

not a business judgment rule that applies to the question of prudence in the

management of an ERISA plan, but rather a prudent person standard.") (quoting

*Donovan v. Mazzola*, 716 F.2d 1226, 1231 (9th Cir.1983), *cert. denied sub nom.,*

*Mazzola v. Donovan*, 464 U.S. 1040, (1984)).

In *Hughes v. Nw. Univ.*, the Supreme Court vacated and remanded the Seventh

Circuit's affirmation of a dismissal in an excessive recordkeeping fee case. The

Court reiterated its previous holding in *Dudenhoeffer*, that "[b]ecause the content of

the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific." 142 S. Ct. 737, 742 (2022) (quoting *Bancorp*, 573 U.S. at 425); *see also Sacerdote*, 9 F.4th at 109 (the "assessment of any particular complaint is a 'context-specific task.'"). Although the Court noted that "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise", the Court did not instruct that such due regard should heighten the pleading standard in ERISA breach of fiduciary duty cases. In fact, the Court instructed the Seventh Circuit to apply the lower pleading standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). On remand, the Seventh Circuit in *Hughes II* confirmed that "[i]t is in this light that we read the Supreme Court's directive to recognize the 'difficult tradeoffs' that an ERISA fiduciary faces, and the 'range of reasonable judgments' that may be made, and to consider alternative explanations for the fiduciary conduct complained of. But as we discuss next, ***these alternative explanations need not be conclusively ruled out at the pleadings stage***." 63 F.4th at 628 (emphasis added).

Courts in this Circuit and around the country have consistently held that promoting possible alternative explanations in favor of the defendants is improper at the motion to dismiss stage. *See e.g., Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016)

(an ERISA case from this Circuit, holding that "Defendants offer their own facts to contest the plausibility of the allegation that the proprietary funds were underperforming. Defendants' assertions raise factual issues that cannot be resolved at the motion to dismiss stage."); *Falberg v. Goldman Sachs Grp., Inc.*, No. 19 CIV. 9910 (ER), 2020 WL 3893285, at *9 (S.D.N.Y. July 9, 2020) ("Whether such fees are reasonable is a question of fact not determinable on a motion to dismiss"); *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, No. 21 CIV. 8384 (KPF), 2024 WL 2815980, at *9 (S.D.N.Y. May 31, 2024). ("TIAA may later, with the benefit of discovery, rebut the alleged downside of its cross-selling activities, and maintain that such a practice was consistent with its other services offered to the Plan Sponsors. For now, however, Plaintiffs have adequately alleged that the Plan Sponsors breached their fiduciary duty to monitor TIAA's revenues.").

In sum, ERISA's "plausibility standard requires a plaintiff to show at the pleading stage that success on the merits is more than a 'sheer possibility.' *Id*. It is not, however, a 'probability requirement.'" *Braden*, 588 F.3d at 594 (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)); *see also Sweda*, 923 F.3d at 333 ("Although Penn may be able to demonstrate that its process was prudent, we are not permitted to accept Penn's account of the facts or draw inferences in Penn's favor at this stage of litigation.").

## ARGUMENT

### I. Defendants Breached Their Fiduciary Duties in Failing to Monitor the Plan's RKA Fees

#### A. The District Court Erred in Denying Plaintiffs' Motion to File an Amended Complaint by Applying an Improper Standard of Review Under a Rule 12(b)(6) Motion to Dismiss to the Proposed Third Amended Complaint

The District Court erred in denying Plaintiffs' Motion to File a Third Amended Complaint. Specifically, the District Court erred in finding that the proposed amendment would be "futile" because the amended pleading could not withstand a motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(6). APP022, *Boyette*, 2024 WL 1484115, at *4. The District Court did not view the "allegations as a whole," *Hughes*, 142 S. Ct. at 739, or "draw[] all reasonable inferences in the plaintiffs' favor." *Sacerdote*, 9 F.4th at 106-107. Indeed, courts do not require an ERISA plaintiff "'to rule out every possible lawful explanation for the conduct he challenges.' To do so 'would invert the principle that the complaint is construed most favorably to the nonmoving party' on a motion to dismiss." *Id.* at 108 (citing *Braden*, 588 F.3d at 597).

Specifically, "allegations concerning fiduciary conduct, such as reasonableness of compensation for services are inherently factual questions" and should not be addressed at the motion to dismiss stage. *Sweda*, 923 F.3d at 329. Per the Second Circuit, Plaintiffs need only plead facts that, if true, would be a redressable breach of Defendants' duty of prudence regarding excessive RKA fees.

*Pension Benefit Guar. Corp.*, 712 F.3d at 718. Plaintiffs need not directly allege how defendants mismanaged the Plan so long as there is "substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred." *Id*. "[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a "reasonable inference" that the defendant committed the alleged misconduct." *Id.* (quoting *Iqbal*, 556 U.S. at 678, (S.Ct. 2009)); *see also Carfora*, 2024 WL 2815980, at *7 (applying *Sacerdote* and *Hughes* in holding that "Plaintiffs' theory of breach lies in the inaction of Plan Sponsors, such that this lack of detail is not necessarily fatal to Plaintiffs' claims.").

Plaintiffs submit that the District Court's holding ignores the TAC's multi-faceted service-based allegations, as well as the allegations regarding the Plan's size and prevailing marketplace. Taken holistically, these allegations plausibly infer that Defendants could not have acted prudently. Worse yet, the District Court did not apply the Second Circuit's holding in *Sacerdote*, but instead relied on materially distinguishable district court and out-of-circuit cases. Many of the District Court's cases pre-dated *Hughes* and *Sacerdote*, thereby rendering their holdings unreliable. The District Court's improper fact-finding and application of the wrong legal standard means the District Court's holding on futility was erroneous. This Court should reverse the District Court's decision denying Plaintiff-Appellants' Motion to

File a Third Amended Complaint and remand this case to the District Court for further proceedings on the merits.

### B. The District Court Erred in Failing to Consider the TAC's Robust Circumstantial Evidence that Defendants Breached Their Fiduciary Duties.

The TAC provides the types of circumstantial evidence found to be sufficiently inferential by courts within this Circuit and around the nation. The TAC contrasts the Plan's fee history against the backdrop of the marketplace to show that Defendants procedurally breached their duty of prudence by failing to conduct RFPs and negotiations at reasonable intervals, and alleges how these processes would have led to results benefiting the Plan and participants. APP283. *See Mator*, 2024 WL 2198120, *7; *Hughes II*, 63 F.4th at 626; *In re Omnicom ERISA Litig.*, No. 20-CV-4141 (CM), 2021 WL 3292487, at *15 (S.D.N.Y. Aug. 2, 2021) (upholding allegations "that Omnicom should have been able to negotiate a much lower per-participant recordkeeping fee, noting that Fidelity generally charges recordkeeping fees of no more than $14–$21 per participant."). The TAC includes a table of Plan fees between 2016-2022 to demonstrate the consequences of implementing and failing to monitor an asset-based fee structure. APP285-86 (TAC ¶ 95). Also, the TAC presents tables comparing the direct costs of the Plan to the direct costs of 25 comparator plans using the plans' Form 5500s that account for size and service

factors, thereby demonstrating that the fees paid by the Plan far exceeded comparable plans. APP287-90 (TAC ¶¶ 102-03).

Form 5500s are consistently held to be reliable sources of comparator plan information at the motion to dismiss stage. Recently, the Third Circuit Court of Appeals in *Mator* held that the comparability of other plans can be plausibly pled using Form 5500s even though the forms cannot provide "complete information." *Mator*, 2024 WL 2198120, at *3. Form 5500s are even deemed reliable data at the more scrupulous summary judgement stage. *See e.g., Garthwait v. Eversource Energy Co.*, No. 3:20-CV-00902 (JCH), 2022 WL 3019633, at *17 (D. Conn. July 29, 2022) (referring to Form 5500s and holding that the expert's "use of publicly available data does not render his testimony unreliable."); *Troudt v. Oracle Corp.*, No. 16-CV-00175-REB-SKC, 2019 WL 1006019, at *4 (D. Colo. Mar. 1, 2019) ("Plaintiffs' suggestion that the Plan's Form 5500 did not report the amount of Fidelity's compensation is simply wrong.").

The TAC also pleads the type of facts about the prevailing recordkeeping service marketplace that courts routinely find supportive of allegations that a plan's fees are excessive in relation to services rendered, meaning allegations that service specifics are unrelated to pricing. "[T]he majority of judges addressing specific allegations regarding the fungibility and commodification of recordkeeping services have found the excessive-fees claims to be plausible." *Dionicio v. U.S. Bancorp*,

No. 23-CV-0026 (PJS/DLM), 2024 WL 1216519, at *4 (D. Minn. Mar. 21, 2024), *motion to certify appeal denied*, No. 23-CV-0026 (PJS/DLM), 2024 WL 2830693 (D. Minn. June 4, 2024). Plaintiffs list the standard essential services for defined contribution plans, top ten recordkeepers providing these services, explain that fees are based on percentage of assets or number participants (rather than services), and that the marketplace for recordkeeping is competitive. "These allegations make it unnecessary to compare individual services to individual services, because all recordkeepers provide the same bundled services, and the total price of the bundle remains the same no matter which of the individual services within the bundle a mega plan chooses to use." *Id*. at *4. Plaintiffs also provide service codes listed on the Form 5500s for the comparator plans and explain how they codify similar recordkeeping services, that merely appear different, and Plaintiffs provide specific services found in the Plan's recordkeeping service agreements. APP288 (TAC. ¶ 102 n.15). Finally, the TAC includes the Fidelity Stipulation, which corroborates the allegations that fees for mega-plans are negotiated based on size, not services, especially for the Plan's recordkeeper. APP291 (TAC ¶107).

Circuit Courts have also dispensed with the same reasoning the District Court made here. Recently, the Third Circuit Court of Appeals in *Mator* reversed the dismissal of a complaint alleging that "the retirement plan services market is 'highly competitive,'", plans with a larger number of participants can leverage lower fees,

and the challenged fee structure was imprudent because it led to an increase in fees "just because participants have contributed more to their accounts or the market has gone up", while services remain the same. 2024 WL 2198120, at **2, 7. Also, like here, the complaint in *Mator* includes a table of comparator plans, ranging in size, that paid less in fees for similar services based on their Form 5500s. *Id*. at *3. The *Mator* complaint did not include that plan's service agreements, making the services alleged in the TAC even more specific than *Mator*. According to the Third Circuit, these allegations are plausible even though the Form 5500s cannot provide "complete information." *Id*. at *3. The court explained that, consistent with the plausibility standard, "[t]he different service codes do not undermine the *Mators'* comparisons because they apparently overlap." *Id*. at *7. Like the district court in *Mator*, the District Court here erroneously applied a heighted pleading standard and interpreted the Form 5500s in the light most favorable to the defendants. Nevertheless, "[t]he correct standard is less demanding: the allegations must move the claim 'from conceivable to *plausible*.'" *Id*. at *11 (citing *Twombly*, 550 U.S. at 570) (emphasis in original).

Similarly, the Fifth Circuit Court of Appeals recently issued a decision in *Perkins v. United Surgical Partners*, No. 23-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024). Like here, the plaintiff-appellants in *Perkins* compared their plan to comparably sized plans using Form 5500s with similar service codes. *Id*. at *4 n.6

The court distinguished the defendant's proffered cases which held that RKA fees were not sufficiently pled in relation to services rendered, "because the plaintiffs [in those cases] either compared recordkeeping costs for their plan to industry-wide averages or failed to compare their plans with similarly sized plans or did not offer a comparison between plans offering similar recordkeeping services." *Id.* at *5 (distinguishing cases also relied on by the District Court here, such as *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023) and *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022)). Like *Perkins*, the instant TAC includes adequate comparisons based on size and services.

A review of district court decisions from this Circuit reveals that the same type of facts plausibly allege imprudence regarding excessive RKA fees. In *Ruilova v. Yale-New Haven Hosp., Inc*., the plaintiffs alleged that the recordkeeping marketplace is "extremely competitive for large plans, that informed fiduciaries are aware of this and will leverage a large plan's participant count to obtain lower RK & A fees by regularly soliciting competitive bids from other recordkeepers…" and a comparison of the plan's fees to similarly sized plans using form 5500s "infer[ed] that Defendants paid more than comparable plans for the same services because they failed to use a prudent process…" No. 3:22-CV-00111-MPS, 2023 WL 2301962, *17 (D. Conn. Mar. 1, 2023). The Court explained that "Courts in this Circuit have

consistently found that allegations of this kind are sufficient to state a claim." *Id.* (internal citations omitted).

Likewise, in *Carrigan v. Xerox Corp.*, the plaintiffs alleged that comparable plans paid less in RKA fees than the plan and that, despite the plan's size, and it "did not attempt to leverage a competitive recordkeeping fee from the affiliated recordkeepers or a competitor." No. 3:21-CV-1085 (SVN), 2022 WL 1137230, at *5-7 (D. Conn. Apr. 18, 2022). The defendant argued that the plaintiffs did not allege specific details about the fiduciaries' process, but the court pointed to *Sacerdote*, and held that "[p]laintiffs' circumstantial allegations allow the Court to 'reasonably infer' that the process by which the Committee hired the recordkeepers 'was flawed,' and that a reasonably prudent plan fiduciary would have handled such circumstances differently." *Id.* Again, Plaintiffs here make sufficiently inferential allegations when viewed holistically.

Multiple other cases throughout the Second Circuit are in accord. *See In re Omnicom ERISA Litig.*, 2021 WL 3292487, at *15 ("Whether Omnicom actually would have been able to secure a lower rate … is a matter reserved for later."); *Garthwait*, 2021 WL 4441939, at *8; *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 685 (D. Conn. 2018) (finding plaintiffs' allegations that "defendants breached their duty of prudence by failing to employ strategies that would lower recordkeeping fees, such as installing a system to monitor and control fees; periodically soliciting bids

in order to compare cost and quality of recordkeeping services; leveraging the Plan's "jumbo" size to negotiate for cheaper recordkeeping fees; consolidating from two recordkeepers to one; and implementing a flat fee rather than a revenue–sharing structure" sufficient to deny the motion to dismiss); *Carfora*, 2024 WL 2815980, at *9 ("Relatedly, it is the sheer magnitude of the increase in revenue, coupled with the fact that TIAA's cross-selling allegedly provided little benefit to the plans themselves, that also supports a pleading-stage inference that the fees were excessive").

In short, taken holistically, the TAC plausibly alleges Defendants' imprudence and the comparability of Plan services in line with Second Circuit precedent. Therefore, this Court should reverse the District Court's decision denying Plaintiff-Appellants' Motion to File a Third Amended Complaint and remand this case to the District Court for further proceedings on the merits.

### C. The Court Improperly Viewed Facts and Alternative Theories in a Light Most Favorable to Defendants.

Courts in this Circuit and around the country have consistently held that promoting possible alternative explanations of the facts in favor of the defendants is improper at the motion to dismiss stage. *See e.g., Sacerdote*, 9 F.4th at 108; *Moreno*, 2016 WL 5957307, at *6; *Falberg*, 2020 WL 3893285, at *9; *Carfora*, 2024 WL 2815980, at *9; *Hughes II*, 63 F.4th at 633; *Mator*, 2024 WL 2198120, at *10. Here,

the District Court made improper and incorrect factual determinations in favor of Defendants.

The District Court factually found that, "In the SAC and TAC, the plaintiffs allege that the "reasonable" range of per-participant recordkeeping fees was between $25 and $30", but the TAC lists the Plan's "average cost per participant of $43 to $41" APP028, *Boyette*, 2024 WL 1484115 at *6[6]. The court held that this "would not make the fees charged by the Plan unreasonably excessive, particularly because the services provided, as indicated in the plan documents, included all of the optional services." *Id*. The court also erroneously found that "The plaintiffs' TAC does not plead with specificity what services provided by the recordkeepers for the eight comparator plans were the same as those provided by the Plan's recordkeepers." APP027, *Boyette*, 2024 WL 1484115 at *6. Not so. The complaint alleges that the Plan's service agreements "show no more services than the standard recordkeeping services listed" as essential, lists plans with comparable service codes, and alleges that plan size, not services, dictate pricing. APP275-77 (TAC ¶¶, 62-64). The District Court improperly discerned what a reasonable fee is and the weight of plan

---

[6] The court also points out that Named Plaintiff Jiminez paid $31 per year, but the Plan used an asset-based fee structure rather than the prudent alternative per-participant fee structure. So, although Jiminez was paying more than the reasonable per-person fee, he was also paying more than the result of a prudently re-negotiated asset-based fee and less than the average Plan participant.

services. The District Court's reading of the facts was not only incorrect, but also the factual finding improperly promoted alternative explanations in Defendants' favor.

### D. The District Court Erred in Dismissing Plaintiffs' TAC Purportedly Because the Plaintiffs Did Not Plead Similar Enough Comparators.

#### a. The Court Applied a Heightened Pleading Standard in Reviewing the Comparability of Recordkeeping Services.

The District Court noted plaintiffs must plausibly allege that "the administrative fees were excessive relative to the services rendered." APP020, *Boyette*, 2024 WL 1484115, at *3 (quoting its prior opinion, APP242, *Boyette*, 2023 WL 7612391, at *6). However, the District Court misapplied the concept of relativity when holding that "'the plaintiffs' allegation 'that all recordkeepers offer the same range of services,' see TAC ¶ 51, 'does not mean that all plans employing a particular recordkeeper received an identical subset of services within that range.'" APP028, *Boyette*, 2024 WL 1484115, at *6 (citing APP242-43, *Boyette*, 2023 WL 7612391, at *6). The plausibility standard does not require specific, mirror-image lists of services to satisfy the relativity factor. The services need to be just that- relative. The TAC alleges that services are incidentally connected to fees in the sense that they are an equally uninfluential factor amongst competing recordkeepers, who instead compete to offer the lowest price for the same essential services, with plan size and fee structure being the driving factor in pricing. *See e.g., Hughes II,*

F.4th at 631-632 ("Plaintiffs also plead that because recordkeeping services are "commoditized ... recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the Plans.' […] plaintiffs plead that the fees were excessive relative to the recordkeeping services rendered.") (alterations added). Again, "the majority of judges addressing specific allegations regarding the fungibility and commodification of recordkeeping services have found the excessive-fees claims to be plausible." *Dionicio*, 2024 WL 1216519, at *4; *see also*, *Mator*, 2024 WL 2198120 at *3; *Perkins*, 2024 WL 1574342 *5; *Carrigan; In re M&T Bank Corp. ERISA Litig.*, No. 16-CV-375 FPG, 2018 WL 4334807, at *8 n.10 (W.D.N.Y. Sept. 11, 2018); *Vellali*, 308 F. Supp. 3d at 684 n.2.

The District Court offers no case law, apart from its own earlier opinion in this case, that the Plan's services need to be compared to "an ***identical*** subset of services" in order for excessive fees to be plausible. As mentioned, service agreement information is solely within the possession of each plan, and ERISA plaintiffs do not need such exacting details to survive a motion to dismiss. *Braden*, 588 F.3d at 598. Indeed, a decision out of the Southern District of New York noted that "[t]he overwhelming majority of judges in this district do not require that a plaintiff allege why recordkeeping and administrative fees are excessive in relation

to the 'specific services' the Plan provided." *In re Omnicom ERISA Litig.*, 2021 WL 3292487 at *15.

Moreover, the TAC is stronger and adds more specifics than other complaints that have been upheld under similar circumstances. The TAC includes the Plan's actual service agreements with Principal and Fidelity, and states that the services were not above and beyond standard services to justify higher fees. Corroborating that allegation are the charts of comparator plans utilizing Fidelity or one of Fidelity's peer group competitors as a recordkeeper during the Class Period.

First, the TAC demonstrates how prudent fiduciaries leverage the number of participants, rather than assets under management or services, to lower RKA fees. Second, the TAC explains how the service codes of the comparator plan's public filings substantiate the comparability of their services with the Plan's services. Strangely, the district court stated that "Perhaps in recognition of this [comparison] deficiency, the plaintiffs eliminated any reliance on the recordkeeping codes of competitor services, compare SAC ¶ 105 n. 15, with TAC ¶ 102 n. 19 (conceding 'coding itself can be subjective, with no agreed upon methodology in the industry, so reliance on coding *alone* is not accurate.')." APP027, *Boyette*, 2024 WL 1484115, at *6 (emphasis added). Actually, the TAC's footnote goes on to explain that "For example, some plan 5500s will simply use code 64 for recordkeeping while other will elect to add nearly twelve other codes in an abundance of caution."

APP288 (TAC ¶ 102 n. 19). Meaning, recordkeeping services may not appear to be the same, but in fact the codes indicate the same, or materially similar, services. *See e.g. Mator,* 2024 WL 2198120 at *7 ("The different service codes do not undermine the Mators' comparisons because they apparently overlap."). Importantly, any more detailed information regarding services performed by the comparator plans' recordkeepers are of the type that "tend systematically to be in the sole possession of defendants [fiduciaries]." *Braden*, 588 F.3d at 598.

Furthermore, the TAC did not rely on "coding *alone*", it also included comparator plans with the same recordkeeper at the same time, and a stipulation from that recordkeeper that services were quoted "regardless of services", the Plan's service agreements, and allegations that services are fungible where size is the true driver of price. Notably, between 2019-2022, the Plan paid between $41-$63 while the highest any of the comparator plans paid during this period was $36. APP287-90 (TAC, ¶¶ 102-03). The District Court ruled that these comparators could not infer an imprudent process because they did not have "an *identical* subset of services." Yet, presuming the services are the true determinative fee factor not only ignores the rest of Plaintiffs' service-based allegations, but also improperly interprets the allegations in a light most favorable to Defendants. Under the correct review standard, Plaintiffs' allegations are sufficient to survive a motion to dismiss because, "[a]n equally, if not more, plausible inference would be that the university neglected

to keep its recordkeeping fees paid through revenue sharing at a reasonable level." *Hughes II*, 63 F.4th at 633; *see also Mator*, 2024 WL 2198120, at \*10 ("Wesco's alternative explanation is not more reasonable or better supported than the Mators' theory of misconduct, given the magnitude of the differences in fees…").

The District Court ignored these facts and their holistic totality of plausible imprudence and instead promoted a version of facts in favor of Defendants.

### b. The Court Applied a Heightened Pleading Standard in Reviewing the Comparability of Plan Size.

The District Court also stated that the TAC "offer[s] no alternative plan that has a comparable number of participants or assets under management as the Plan, which had at least 22,000 participants and over $2 billion dollars in assets under management during the class period." APP027, *Boyette*, 2024 WL 1484115, at \*6. That is untrue. For example, Paragraph 102 of the TAC includes the Publicis Benefits Connection 401K Plan with over $2 billion dollars in assets under management and has Fidelity as a recordkeeper during the same year as the Plan. In 2021, the Plan had $3 billion dollars in assets under management in AUM. In that same year the Kaiser Permanente Supplemental Savings and Retirement Plan also had over $3 billion dollars in assets under management while paying less in fees. The Plan was paying $63 while the Kaiser Permanente plan was paying $27.

Recently, in *Mator*, the Third Circuit instructed that it did not know of any "authority on how close comparators must be in size," but found that listing at least three plans within 75%-to-125% of the size of the plan was sufficient. *Mator*, 2024 WL 2198120, at *8. *Mator's* logic supports finding plausibility here. Specifically, in 2021, the JBS plan was paying $25, the Deseret Plan was paying $25, and the Fedex Plan was paying $30 per participant. APP287-88 (TAC ¶102). The Plan's participant count was at most 25% larger than the JBS and the Fedex plans, and thus should have been paying 25% less, but instead ***the Plan was paying more than double*** these comparators at $63 per participant. The Plan's assets under management were roughly 14% higher than the assets in the Deseret Plan, but the Plan paid more than two and a half times what the Deseret Plan paid, and although the Plan had roughly two thirds the number of participants as the Deseret plan, it was paying $38 more in fees rather than the proportionate $8.33 more per participant it should have been paying. Hence, these three comparator plans show that a per-participant fee structure would be the best way to leverage the Plan's size and maintain lower fees. Put differently, "assuming the truth of the allegations that large plans have superior bargaining power and the cost per participant falls as participant numbers increase, the smaller comparators actually strengthen the complaint." *Mator*, 2024 WL 2198120, at *8.

Notably, the TAC incorporates seven other Fidelity plans and the Stipulation. Applying the holistic approach necessitates considering the Plan's basic service package against the similarly sized comparator plans paying half of what the Plan paid while receiving the same or more services. Thus, Plaintiffs' RKA allegations surpass the plausibility standard applied by even the strictest circuit courts. Requiring any more from plaintiffs would implicitly heighten the pleading standard from plausible to probable. Not only did the District Court misapply the applicable law in the Second Circuit, but it also failed to recognize that Plaintiffs did sufficiently plead information regarding the type and quality of services provided.

### E. The District Court Ignored Second Circuit Precedent.

The District Court denied Plaintiffs' motion to amend the complaint without evaluating the pleadings under *Sacerdote*, or the later decided Supreme Court decision in *Hughes*. Instead, the court referenced its prior decision dismissing the Second Amended Complaint, (*Boyette v. Montefiore Medical Center*, 22-cv-5280, 2023 WL 7612391 (S.D.N.Y. Nov. 13, 2023), APP226), and the district court decision in *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259 (S.D.N.Y. 2023). *Singh* is another decision issued by Judge Koeltl and is currently on appeal (oral argument was held on May 24, 2024). Many of the arguments against *Singh's* holding are identical here. Moreover, the District Court's prior opinion does not mention *Sacerdote*, and relies on materially distinguishable district court and out-of-circuit

cases. In fact, many of the District Court's cited cases were issued before the clarity of *Hughes* and *Sacerdote*, such as *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-cv-6685, 2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) and *Meiners v. Wells Fargo & Co.*, 898 F.3d 820 (8th Cir. 2018). *Meiners* also did not involve RKA fee allegations.

*Ferguson* predates *Hughes* and *Sacerdote* by a few years, but Plaintiffs will distinguish it for the sake of argument. The complaint in *Ferguson* failed because it alleged "that the Plan's total plan cost is excessive as compared with other plans of similar market power", but "it does nothing more." 2019 WL 4466714, at *7. The court distinguished that complaint from the upheld complaint in *Vellali*, another case from this Circuit. The court explained that, like here, the complaint in *Vellali* sufficiently "alleged that the cost of recordkeeping under the plan swelled out of proportion to actual recordkeeping services provided and that the fiduciaries' decision-making process was deficient in terms of monitoring, soliciting competitive bids, negotiating, and selecting reasonably priced recordkeepers", and the *Vellali* complaint "compared the general range of costs for a flat fee arrangement to estimates of the cost for the plan's recordkeeping arrangement, highlighted the competition among third-party recordkeepers, and quoted the advice of industry experts who recommended consolidation." *Ferguson*, 2019 WL 4466714, at *7-8 (citing *Vellali*, 308 F. Supp. at 685). Consolidating plans is inapplicable here where

there is only one Plan, but the rest of the facts alleged in *Vellali*, and approved by the court in *Ferguson,* are present here. Thus, the District Court's reliance on *Ferguson* is misplaced.

The District Court also relied on *Gonzalez v. Northwell Health, Inc.*, 632 F. Supp. 3d 148 (E.D.N.Y. 2022)*,* but the TAC actually satisfies the deficiencies the court found lacking in that complaint. The complaint in *Gonzalez* based its excessive recordkeeping allegations "principally on a comparison of the recordkeeping fees billed to Plan participants to the $35 average per participant fee reported in the 401k Averages Book for 'smaller plans'", did "not allege that there are entities that could provide the Plan with services comparable to Transamerica's at lower rates", and did "not even list all the services that Transamerica provides to the Plan." *Gonzalez*, 632 F. Supp. 3d at 166-67. Here, the TAC's allegations do not rest on averages, but instead lists the Plan's specific services obtained and alleges that competing recordkeepers, including the Plan's own recordkeeper, could provide those same services for less.

The District Court's earlier opinion also points to the Tenth Circuit holding in *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136 (10th Cir. 2023) for the proposition that Plaintiffs' claims are implausible because they "failed to allege with specificity what recordkeeping services the Plan received, nor do they plead that the services provided by the recordkeepers for the comparator plans were the same as

those provided by the Plan's recordkeepers." APP243, *Boyette*, 2023 WL 7612391, at*6. While the earlier opinion discussed the deficiencies in the SAC, the TAC cures these deficiencies by alleging specific service-based comparisons, unlike the comparisons in *Matney*. Like the distinguishable cases of *Smith* and *Gonzalez*, the complaint in *Matney* "fails to offer factual allegations about the services provided either by Barrick Gold's plan or the plans assessed in the 401k Averages Book." *Matney*, 80 F.4th at 1157-58. Here, the TAC offers service-based allegations.

Further, the Tenth Circuit in *Matney* also upheld the district court's dismissal of that complaint because the pleadings showed that plan's revenue sharing fee structure indisputably benefited that plan, whereas here, the TAC demonstrates the Plan suffered under an asset-based fee structure when a per-person fee structure would cost participants less for the same services. *Id*. at 1146. Finally, in *Matney* there was "no question that [the Committee] regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants." Here, the Plan endured increases in RKA fees for four years in a row (between 2018 and 2021) while the asset-based fee remained at .00037%, making it implausible that Defendants regularly negotiated the Plan's fees or considered readily available fee structure alternatives. APP285-68 (TAC ¶ 95). *Matney's* pleadings cannot be likened to the instant TAC.

While there will of course be some complaints that do not meet the plausibility standard in breach of fiduciary duty cases, the TAC is materially similar to, and even more robustly pled than, other complaints which courts have found plausibly pled excessive recordkeeping costs. The District Court erred in disregarding the holdings of *Sacerdote* and *Hughes*, while relying on materially distinguishable cases.

## II. The Third Amended Complaint Alleges Sufficient Facts to State A Claim for Failure to Monitor.

The District Court also discarded Plaintiffs' failure to monitor claim, because "this claim is derivative of Count I, that the defendants breached the fiduciary duty of prudence, see TAC ¶¶ 110-117, and the plaintiffs' amendment is futile for the reasons discussed above." APP028-29, *Boyette*, 2024 WL 1484115, at *6. However, because Plaintiffs have adequately alleged that Defendants breached their fiduciary duty of prudence under ERISA, this Court should also reverse the District Court's decision to dismiss this claim. *Moreno*, 2016 WL 5957307, at *8.

## CONCLUSION

For the forgoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the District Court's district court's decision to deny Plaintiffs' Motion to Amend the Complaint and direct the case be reopened for further proceedings on the merits.

Dated: July 8, 2024                    Respectfully submitted,

<u>*/s/ Mark K. Gyandoh*</u>
Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA  19066
Telephone: (610) 890-0200
Facsimile:  (717) 233-4103
Email: mark@capozziadler.com


*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.  I certify that this brief complies with the provisions of Fed.R.App.P. 31(a)(4)(1), and that this brief contains 10,375 words, excluding the parts of the brief exempted by Fed.R.App.P. (32)(a)(7).

2.  I certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P 32(2)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word Times New Roman 14 point font.

3. This document has been scanned for viruses and the brief is virus-free.


Dated: July 8, 2024                           */s/ Mark K. Gyandoh*

47

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on July 8, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 8, 2024                    */s/ Mark K. Gyandoh*

# 24-1279

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

SHEILA A. BOYETTE AND TIFFANY JIMINEZ,
individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

MONTEFIORE MEDICAL CENTER, THE BOARD OF TRUSTEES OF
MONTEFIORE MEDICAL CENTER, THE TDA PLAN COMMITTEE, and
DR. MICHAEL STOCKER, *Defendants-Appellees*
and John Does 1-30, *Defendants*

**Appeal from the United States District Court for the
Southern District of New York**

**SPECIAL APPENDIX, SA1-SA17
FOR PLAINTIFFS-APPELLANTS**

Mark K. Gyandoh
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax: (717) 233-4103

*Attorneys for Plaintiffs-Appellants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

SHEILA A. BOYETTE and TIFFANY
JIMINEZ, individually and on behalf
of all others similarly situated,          22-cv-5280 (JGK)

                Plaintiffs,          MEMORANDUM OPINION AND
ORDER

       - against -

MONTEFIORE MEDICAL CENTER, THE BOARD
OF TRUSTEES OF MONTEFIORE MEDICAL
CENTER, THE TDA PLAN COMMITTEE, DR.
MICHAEL STOCKER, and JOHN DOES 1-30,

               Defendants.
————————————————————————————

JOHN G. KOELTL, District Judge:

The plaintiffs, Sheila A. Boyette and Tiffany Jiminez,

brought this purported class action on behalf of themselves and

all others similarly situated, against the defendants, Montefiore

Medical Center ("Montefiore"), the Board of Trustees of Montefiore

Medical Center (the "Board"), the TDA Plan Committee (the

"Committee"), Dr. Michael Stocker, and John Does 1-30

(collectively, "the defendants"). The plaintiffs alleged that the

defendants violated their fiduciary duty of prudence in violation

of the Employment Retirement Income Security Act ("ERISA"), 29

U.S.C. 1001 et seq.

In a Memorandum Opinion and Order dated November 13, 2023,

this Court granted the defendants' motion to dismiss the Second

Amended Complaint for lack of standing pursuant to Federal Rule of

Civil Procedure 12(b)(1), and for failure to state a claim

pursuant to Federal Rule of Civil Procedure 12(b)(6). See Boyette
v. Montefiore Medical Center, 22-cv-5280, 2023 WL 7612391
(S.D.N.Y. Nov. 13, 2023) (the "First Opinion"). The plaintiffs now
move pursuant to Federal Rule of Civil Procedure 15(a)(2) for
leave to file a Third Amended Complaint. See ECF No. 55-2 ("Third
Amended Complaint"). For the reasons that follow, the plaintiffs'
motion for leave to amend is **denied**.

**I.**

The Third Amended Complaint repeats the bulk of the
allegations from the Second Amended Complaint, which is described
at length in the First Opinion. See Boyette, 2023 WL 7612391, at
*1-2. Familiarity with the First Opinion is assumed. Unless
otherwise noted, the following allegations are taken from the
Second and Third Amended Complaints. Where necessary, the summary
below indicates which allegations are new additions contained only
in the Third Amended Complaint.[1]

**A.**

The plaintiffs are former employees of Montefiore who are
participants in the Montefiore Medical Center 403(b) Plan (the
"Plan"). Second Am. Compl. ("SAC") ¶¶ 20-21; Third Am. Compl.
("TAC") ¶¶ 16-17. The Plan covers substantially all eligible

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits
all alterations, citations, footnotes, and internal quotation
marks in quoted text.

SA002

employees of Montefiore. SAC ¶¶ 43-44; TAC ¶¶ 39-40. From 2017 to 2022, the Plan had over 22,000 participants and over $2 billion in assets under management. TAC ¶¶ 7, 98.

As discussed in the First Opinion, the Plan is a defined contribution plan. SAC ¶ 43; TAC ¶ 6. 29 U.S.C. § 1002(34) defines a defined contribution plan as a

> pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeitures of accounts of other participants which may be allocated to such participant's account.

Participants can contribute to their Plan accounts in several different ways, and Montefiore matches participant contributions up to a certain percentage. SAC ¶¶ 45-46; TAC ¶¶ 42-43.

Montefiore, acting through the Board, appointed the Committee to, among other things, ensure that the investments available to Plan participants were appropriate and that the Plan paid a fair price for recordkeeping services. SAC ¶ 31; TAC ¶ 27. The Committee is the named fiduciary under the Plan with the responsibility to select and monitor the investment alternatives available for participant-directed investment. TAC ¶ 28.

**B.**

The plaintiff Sheila A. Boyette ("Boyette") invested in the Fidelity Freedom 2030 Fund, which was mapped to the Principle Life Time 2030 Inst Fund when the Plan discontinued the Fidelity

3

Freedom Funds. SAC ¶ 20; TAC ¶ 16. The plaintiff Tiffany Jiminez ("Jiminez") invested in the BlackRock LifePath Index 2045 Fund and the MetLife Blended Fund. SAC ¶ 21; TAC ¶ 17.

In both the SAC and TAC, the plaintiffs use the term "recordkeeping" as a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." See SAC ¶ 64; TAC ¶ 60. Fidelity Investments ("Fidelity") and Principal Financial Group ("Principal") serve as the Plan's recordkeepers. TAC ¶ 85. Recordkeeping expenses "can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing." SAC ¶ 74; TAC ¶ 72. The cost of providing recordkeeping services "often depends on the number of participants in a plan[,]" TAC ¶ 67, and thus, "[p]lans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee." Id. While the "vast majority of plans" charge recordkeeping expenses on a per-participant basis, id. 69, the Plan employs an asset-based fee schedule whereby recordkeeping fees are charged as a percentage of each participant's account balance. Id. ¶¶ 16, 17, 69.

In both the SAC and TAC, the plaintiffs allege that the recordkeeping costs for the Plan were higher than those of comparable peer plans. See TAC ¶¶ 16, 16 n.3, 17. The plaintiffs

4

assert that the Plan had substantial bargaining power to negotiate recordkeeping and administrative costs, TAC ¶¶ 8-9, due its size and the number of participants, id. ¶ 7. The plaintiffs assert that

> [T]he Plan, with over 22,000 participants and over $3.4 billion dollars in assets in 2020, should have been able to negotiate a recordkeeping cost anywhere in the mid $20 range per participant from the beginning of the Class Period to the Present. Smaller plans were paying an outlier amount of $35 to $36 meaning the Plan, with its significant number of participants, should have been paying much less than $35 to $36 per participant for [recordkeeping] fees.

Id. ¶ 104.

The TAC derives a fixed "per-participant" recordkeeping fee for participants in the Plan, that the plaintiffs calculate ranges from $34 per participant to $63 per participant during the class period. See TAC ¶¶ 16, 95. The TAC does not allege what percentage of participants paid more than a "reasonable" amount for recordkeeping costs. See, e.g., id. ¶¶ 99-100. Under the asset-based fee structure, The TAC asserts that Boyette paid a "minimal" recordkeeping fee "because Plan fees are based on her account balance which was minimal[.]" Id. ¶ 16. Jiminez complains that she paid $31 per year in recordkeeping fees. Id. ¶ 17.

### C.

In both the SAC and TAC, the plaintiffs allege that the defendants breached their fiduciary duties imposed by ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). See TAC ¶¶ 10, 110-117; SAC ¶¶

SA005

14, 140-147. Specifically, the plaintiffs allege that part of a fiduciary's duty to remain informed about overall trends in the recordkeeping fee marketplace includes conducting a Request for Proposal ("RFP") process at "reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace." TAC ¶ 75; SAC ¶ 78. The plaintiffs allege that, because the Plan "paid astronomical amounts for recordkeeping during the Class Period, there is little to suggest that Defendants conducted an RFP at reasonable intervals . . . to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers[.]" TAC ¶ 88; SAC ¶ 91.

The plaintiffs further allege that, pursuant to 29 U.S.C §§ 1109(a) and 1132(a)(2), the defendants are liable for failing to adequately monitor other fiduciaries, and to restore to the Plan all losses caused by their failure to monitor adequately the Committee. See TAC ¶¶ 116, 124; SAC ¶¶ 146, 154. The plaintiffs allege that the defendants' failure to monitor and evaluate the performance of the fiduciaries, failure to monitor the process, and failure to remove the fiduciaries caused the plaintiffs to suffer "millions of dollars of losses." TAC ¶¶ 122-23; SAC ¶ 152-53.

SA006

The plaintiffs allege that they have standing to bring this action because they participated in the Plan and were injured by the defendants' unlawful conduct. TAC ¶ 18; SAC ¶ 22.

D.

The plaintiffs filed their original complaint against the defendants on June 22, 2022. ECF No. 1. An Amended Complaint was filed on November 14, 2022. ECF No. 21. The Second Amended Complaint was filed March 10, 2023. ECF No. 30. On April 21, 2023, the defendants filed a motion to dismiss the Second Amended Complaint. ECF No. 35. The defendants moved to dismiss for lack of subject matter jurisdiction pursuant to Federal Civil Rule of Procedure 12(b)(1) and for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Id.

In the First Opinion, this Court granted the defendants' motion to dismiss in full. See 2023 WL 7612391, at *1, 8. Recognizing that the Court had recently dismissed a substantially similar case alleging breach of the fiduciary duty of prudence in violation of ERISA, the Court concluded that many of the same reasons warranted dismissal in this case. See id. at *3 (citing Singh v. Deloitte LLP, 650 F. Supp. 3d 259 (S.D.N.Y. 2023)). The Court found that the plaintiffs had failed to plead an injury-in-fact with respect to their claim alleging excessive recordkeeping

7

fees and with respect to their claims challenging the funds that charged excessive expensive ratios. Id. at *4-5.

Although lack of standing was sufficient to dismiss the plaintiffs' complaint on jurisdictional grounds, the Court next found that the plaintiffs had failed to state a claim pursuant to Rule 12(b)(6). The Court concluded that the plaintiffs "must allege more than that the Plan's recordkeeping fees were higher than those of other plans[,]" id. at *6, to state a claim for breach of fiduciary duty under ERISA. Instead, the plaintiffs must plausibly allege that "the administrative fees were excessive relative to the services rendered." Id. (citing Ferguson v. Ruane Cunniff & Goldfarb Inc., No. 17-cv-6685, 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019) and Gonzalez v. Northwell Health, Inc., 632 F. Supp. 3d 148, 167 (E.D.N.Y. 2022)).

Finally, the Court addressed the plaintiffs' claim concerning the defendants' failure to monitor, concluding that this claim was derivative of the plaintiffs' claims for a breach of fiduciary duty, and that the claim should be dismissed for the same reasons. Id. at *7 (citing Coulter v. Morgan Stanley & Co., 753 F.3d 361, 368 (2d. Cir. 2014)).

On December 14, 2023, the plaintiffs filed a motion for leave to file a Third Amended Complaint. ECF No. 55.

SA008

## II.

Federal Rule of Civil Procedure 15(a) provides that courts should "freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, such leave need not be granted "[w]here a proposed amendment would be futile[.]" Hill v. Curcione, 657 F.3d 116, 123-24 (2d Cir. 2011). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." In re Tribune Co. Fraudulent Conv. Litig., 10 F.4th 147, 175 (2d Cir. 2021).

The futility inquiry on a motion for leave to amend is "comparable to that required upon a [Rule 12(b)(6)] motion to dismiss[.]" Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir. 2005). In evaluating whether granting leave to amend would be futile, a court must consider both the proposed amendments and the original complaint, "accepting as true all non-conclusory factual allegations therein, and drawing all reasonable inferences in the plaintiff's favor." Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 225 (2d Cir. 2017); see also Tribune Co., 10 F.4th at 175. The Court should not dismiss the amended complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows

SA009

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

### III.

In the plaintiffs' Third Amended Complaint, the plaintiffs allege that the Plan was charging excessive recordkeeping and administrative fees and that the defendants breached the fiduciary duty of prudence under ERISA by not obtaining lower fees. Granting leave to amend would be futile because substantively the same defects present in the Second Amended Complaint continue to exist in the proposed Third Amended Complaint, except for the Court's conclusion that both plaintiffs lack standing. For the reasons discussed below, the allegations contained in the Third Amended are sufficient to plead an injury-in-fact with respect to Jiminez's claims.

In any event, because the Third Amended Complaint fails to assert a claim of relief that is plausible on its face, see Twombly, 550 U.S. at 570, the plaintiffs' Third Amended Complaint fails on the merits.

### A.

The plaintiffs attempt to cure their lack of standing by pleading that Boyette paid a "minimal" fee because her account balance was "minimal," id. ¶ 16, and that Jiminez paid unreasonable recordkeeping fees of $31 per year, see TAC ¶ 17.

10

**i.**

To establish Article III standing, a party must show that (1) the party has suffered an actual or imminent injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992). The plaintiff bears the burden of proving the Court's jurisdiction by a preponderance of the evidence. Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).

As relevant here, "[t]o qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be concrete and particularized as well as actual or imminent, not conjectural or hypothetical." Baur v. Veneman, 352 F.3d 625, 632 (2d Cir. 2003). Injury is "concrete and particularized" if it "affect[s] the plaintiff in a personal and individual way," Lujan, 504 U.S. at 560 n.1; accord Baur, 352 F.3d at 632, and injury is "actual or imminent" if the plaintiff "has sustained or is immediately in danger of sustaining some direct injury," City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983).

In this case, because Boyette failed to allege any injury in fact, let alone one that is "concrete and particularized," see Lujan, 504 U.S. at 560, Boyette lacks standing with respect to Boyette's claim of excessive recordkeeping fees.

SA011

As for Jiminez, however, the claim that Jiminez was charged an unreasonable fee of $31 per year satisfies the jurisdictional requirement at this stage of litigation. See, e.g., Lujan, 504 U.S. at 561 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim."); Jacobs v. Verizon Comm., Inc., 2020 WL 5796165, at *6 (S.D.N.Y. 2020) (concluding that the plaintiff had sufficiently established standing to seek relief under ERISA, and recognizing that "[i]t is enough that plaintiff has pleaded facts sufficient to demonstrate that its economic position has been materially impaired by reason of defendant's misconduct.").

The defendants argue that the Court can wholly disregard Jiminez's claim that the fee of $31 per year was unreasonable because it is the same fee paid by participants in the General Dynamics Corporation 401(k) Plan that the TAC offers as a "peer" comparator for purposes of establishing its alleged range of reasonable fees. See ECF No. 60 at 14-15; TAC ¶¶ 17, 102. But the question of whether Jiminez's factual allegations survive a motion to dismiss are distinct from whether Jiminez has adequately pleaded allegations sufficient to establish standing. The cases cited by the defendants are correct that "general allegations that are contradicted by more specific allegations in the complaint"

12

cannot survive a motion to dismiss. <u>See</u> ECF No. 60 at 15 (citing

<u>Lindberg v. Dow Jones & Co., Inc.</u>, No. 20-cv-8231, 2022 WL 799664,

at *2 (S.D.N.Y. Mar. 16, 2022); <u>Lamda Sols. Corp v. HSBC Bank USA,</u>

<u>N.A.</u>, 574 F. Supp. 3d 205, 216-17 (S.D.N.Y. 2021); <u>DPWN Holdings</u>

<u>(USA), Inc. v. United Air Lines, Inc.</u>, 747 F.3d 145, 151-52 (2d

Cir. 2014); <u>Pierce v. Fordham Univ., Inc.</u>, No. 15-cv-4589, 2016 WL

3093994, at 2 n.1 (S.D.N.Y. June 1, 2016), <u>aff'd</u>, 692 F. App'x 644

(2d Cir. 2017)). But the district courts in these cases dismissed

the respective complaints for failing to state a claim under

Federal Rule of Civil Procedure 12(b)(6), not for lack of

jurisdiction.

Accordingly, because Jiminez asserted a concrete and

particularized injury with respect to the recordkeeping fees, <u>see</u>

TAC ¶ 17, Jiminez has cured the jurisdictional defect regarding

Jiminez's claim in the prior complaint. <u>See Boyette</u>, 2023 WL

7612391, at *4.

**ii.**

The plaintiffs next make an alternative standing argument

that they have asserted a "derivative claim." The plaintiffs

allege that Boyette and Jiminez have standing because "the

excessive Plan [recordkeeping fee] was paid for using Plan

assets," and the plaintiffs' alleged "claim for an undivided

interest in the Plan assets were diminished when the Plan paid

more for fees than it should have." TAC ¶¶ 16-17. But this

13

argument is unavailing. If the named plaintiffs did not pay
excessive fees, but the Plan as a whole paid excessive fees, then
the plaintiffs could not participate in the distribution of these
excessive fees. Only the participants who paid the excessive fees
could benefit. This why other courts in this district have denied
standing in the defined-contribution context when a plaintiff has
not personally invested in the particular underperforming funds at
issue. See, e.g., In re UBS Erisa Litig., No. 08-cv-6696, 2014 WL
4812387, at *6 (S.D.N.Y. Sept. 29, 2014) ("Plaintiff can only
demonstrate a constitutionally sufficient injury by pointing to
her individual account's specific losses during the class
period."), aff'd sub nom. Taveras v. UBS AG, 612 F. App'x 27 (2d
Cir. 2015) (summary order) (emphasis in original); Patterson v.
Morgan Stanley, 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019); in
re Omnicrom ERISA Litig., No. 20-cv-4141, 2021 WL 3292487, at *1,
10 (S.D.N.Y. Aug. 2, 2021). The plaintiffs appear to recognize
this, because they have stricken the allegations relating to
investments in individual funds in which the plaintiffs did not
participate in keeping with this Court's First Opinion that held
that the plaintiffs lacked standing to complain about inadequate
performance or fees in individual funds in which they did not
invest. Compare SAC ¶¶ 114-138, with ECF No. TAC, ECF No. 55-1
(redline striking prior paragraphs); see also Pls.' Reply at 3 n.1

(conceding the same). Thus, the plaintiffs cannot assert standing based on any "derivative claim."

**B.**

The Court dismissed the Second Amended Complaint because it failed to plausibly allege that the Plan's recordkeeping fees "were excessive relative to the services rendered." Boyette, 2023 WL 7612391, at *6. The plaintiffs now identify eight allegedly comparable plans in order to "show[] that the Plan was paying higher [recordkeeping fees] than its peers for the same services." TAC ¶ 102. But the plaintiffs have failed to cure the deficiencies that warranted dismissal of the SAC.

The plaintiffs' TAC does not plead with specificity what services provided by the recordkeepers for the eight comparator plans were the same as those provided by the Plan's recordkeepers. See Boyette, 2023 WL 7612391, at *6; see also Singh, 650 F. Supp. 3d at 267. Perhaps in recognition of this deficiency, the plaintiffs eliminated any reliance on the recordkeeping codes of competitor services, compare SAC ¶ 105 n. 15, with TAC ¶ 102 n. 19 (conceding "coding itself can be subjective, with no agreed upon methodology in the industry, so reliance on coding along is not accurate."), and offer no alternative plan that has a comparable number of participants or assets under management as the Plan, which had at least 22,000 participants and over $2 billion dollars in assets under management during the class period. See TAC ¶ 98.

15

For this reason, the TAC still lacks the requisite "apples to apples" comparison required "to indicate plausibly imprudence on the part of the defendants." See Boyette, 2023 WL 7612391, at *6. As the Court in the First Opinion made clear, the plaintiffs' allegation "that all recordkeepers offer the same range of services," see TAC ¶ 51, "does not mean that all plans employing a particular recordkeeper received an identical subset of services within that range." Boyette, 2023 WL 7612391, at *6.

The plaintiffs have also dramatically reduced their allegation of the actual recordkeeping costs paid, from $136.51 to $172.70, see SAC ¶ 98, to the average cost per participant of $43 to $41, see TAC ¶ 95, including Jiminez's fee of $31 per year alleged in the TAC, see TAC ¶ 17. In the SAC and TAC, the plaintiffs allege that the "reasonable" range of per-participant recordkeeping fees was between $25 and $30. See SAC ¶ 103; TAC ¶¶ 99-100. That would not make the fees charged by the Plan unreasonably excessive, particularly because the services provided, as indicated in the plan documents, included all of the optional services. See TAC ¶¶ 62-64.

Finally, regarding the plaintiffs' amended claim that the defendants failed to monitor the Plan Committee, see TAC ¶¶ 118-24, this claim is derivative of Count I, that the defendants breached the fiduciary duty of prudence, see TAC ¶¶ 110-117, and the plaintiffs' amendment is futile for the reasons discussed

SA016

above. See Boyette, 2023 WL 7612391, at *7 (dismissing failure to
monitor claim based on insufficiently pleaded claim for breach of
fiduciary duty); see also Singh, 2023 WL 4530650, at *6 (denying
leave to amend derivative failure to monitor claims based on
futility of underlying claims).

### CONCLUSION

The Court has considered all of the arguments of the parties.
To the extent not specifically addressed above, the arguments are
either moot or without merit. For the foregoing reasons, the
plaintiffs' motion to amend the complaint is **denied**. The Clerk is
respectfully directed to close ECF No. 55.

**SO ORDERED.**

Dated:    New York, New York
          April 5, 2024

                                  _____
                                        John G. Koeltl
                                  United States District Judge

17

**SA017**