# 24-1279

*In the*

# United States Court of Appeals

*for the*

# Second Circuit

───────────────────────────

Shiela A. Boyette and Tiffany Jiminez,
individually and on behalf of all others similarly situated,

*Plaintiffs-Appellants,*

– v. –

Montefiore Medical Center, The Board of Trustees of
Montefiore Medical Center, The TDA Plan Committee,
Dr. Michael Stocker, and John Does 1-30,

*Defendants-Appellees.*

───────────────────────────

On Appeal from a final judgment of the
United States District Court for the Southern District of New York
Case No. 22-cv-0280, Hon. John G. Koeltl

───────────────────────────

**BRIEF FOR DEFENDANTS-APPELLEES**

───────────────────────────

John J. Calandra
   *McDermott Will & Emery LLP*
   *One Vanderbilt Avenue*
   *New York, New York 10017*
   *(212) 547-5400*

Michael B. Kimberly
Charles Seidell
   *McDermott Will & Emery LLP*
   *500 N. Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*Counsel for Defendants-Appellees*

## DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel for Defendants-Appellees certifies that The Board of Trustees of Montefiore Medical Center, the TDA Plan Committee, Dr. Michael Stoker, and John Does 1-30 are not corporate entities. Defendant-Appellee Montefiore Medical Center is a nongovernmental not-for-profit corporate entity, whose sole corporate member is Montefiore Health System, Inc. Montefiore Health System, Inc., is a nongovernmental not-for-profit corporation whose sole corporate member is Montefiore Medicine Academic Health System, Inc. Montefiore Medicine Academic Health System, Inc., is a nongovernmental not-for-profit corporation, and no parent corporation or publicly held corporation owns 10% or more of its stock.

September 11, 2024                           /s/ *Michael B. Kimberly*

i

# TABLE OF CONTENTS

Table of Authorities ......................................................................... iii

Introduction ....................................................................................... 1

Issues Presented for Review ............................................................. 2

Statement of the Case ....................................................................... 2

    A.   Legal background .............................................................. 3

    B.   Factual background ........................................................... 5

    C.   Procedural background ..................................................... 9

Summary of the Argument ............................................................... 15

Argument ......................................................................................... 17

I.    The TAC failed to allege a plausible breach of ERISA's duty of
prudence ................................................................................... 19

    A.   Plaintiffs in ERISA actions must satisfy the standard Rule 8
pleading requirements as described in *Iqbal* and *Twombly* ............... 19

    B.   Plaintiffs' own allegations contradict their claims ......................... 24

        1.   The TAC alleges that the Plan didn't renegotiate its
recordkeeping fees, but then says otherwise............................. 25

        2.   The TAC alleges that the Plan paid unreasonable
recordkeeping fees, but then says otherwise............................. 28

    C.   Plaintiffs failed to plausibly allege that the plan overpaid
relative to the services it received ..................................... 35

        1.   The plan documents contradict the TAC's bald assertion
that the services provided were uniform and fungible................ 36

        2.   The complaint fails to provide an apples-to-apples
comparator even without considering services ......................... 42

        3.   The Fidelity stipulation is irrelevant according to
plaintiffs' own theory of the case ............................. 47

II.   The failure to monitor claim fails both independently and as a
derivative claim ................................................................... 49

Conclusion ....................................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Metro N. Commuter R.R.*,
  882 F.2d 705 (2d Cir. 1989) ..........................................................31

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................*passim*

*Austin v. Forder Models, Inc.*,
  149 F.3d 148 (2d Cir. 1998) ......................................................... 30

*Barnett v. Cirt of Chicago*,
  969 F. Supp. 1359 (N.D. Ill. 1997).......................................... 38, 39

*Barrett v. O'Reilly Automotive, Inc.*,
  2024 WL 3980839 (8th Cir. Aug. 29, 2024) ................... 41, 42, 47

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544,554 (2007).......................................... 20, 21, 22, 23

*Conkright v. Frommert*,
  559 U.S. 506 (2010) ..................................................................... 3

*Coulter v. Morgan Stanley & Co., Inc.*,
  753 F.3d 361 (2d Cir. 2014) ......................................................... 49

*Cunningham v. Cornell University*,
  86 F.4th 961 (2d Cir. 2023) ...................................................*passim*

*Divane v. Northwestern University*,
  953 F.3d 980 (7th Cir. 2020)......................................................... 45

*DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,
  747 F.3d 145 (2d Cir. 2014) ....................................... 18, 23, 28, 36

*Fifth Third Bancorp v. Dudenhoeffer*,
  573 U.S. 409 (2014) ..................................................................... 22

*Fink v. Time Warner Cable*,
  714 F.3d 739 (2d Cir. 2013) ......................................................... 28

*Fritton v. Taylor Corp.*,
  2022 WL 17584416 (D. Minn. 2022)........................................... 48

**Cases—continued**

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016) ......................................... 39

*Harmon v. Shell Oil Co.*,
    No. 3:20-cv-21, ECF 134 (S.D. Tex. 2021) .................................... 49

*Hughes v. Northwestern University*,
    595 U.S. 170 (2022) ...............................................*passim*

*Hughes v. Northwestern University*,
    63 F.4th 615 (7th Cir. 2023) ................................... 34, 35

*Johnson v. PNC Financial Services Group, Inc.*,
    2021 WL 3417843 (W.D. Penn. 2021) ......................................... 48

*Jones-Cruz v. Rivera*,
    2022 WL 20437017 (S.D.N.Y. 2022) ...........................................31

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ................................... 44, 45

*Mateya v. Cook Group Inc.*,
    2023 WL 4608536 (S.D. Ind. 2023) ............................................ 47

*Matney v. Barrick Gold of North America*,
    80 F.4th 1136 (10th Cir. 2023) ............................................ 27, 28

*Mator v. Wesco Distribution, Inc.*,
    102 F.4th 172 (3d Cir. 2024) ........................................ 22, 46, 47

*McCarthy v. Dun & Broadstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ............................................ 3

*Moitoso v. FMR*,
    No. 18-cv-12122, ECF 138-67 (D. Mass. 2020) ............................ 47

*NAACP, Inc. v. Cirt of Niagara Falls*,
    65 F.3d 1002 (2d Cir. 1995) ............................................ 39

*Nachman Corp. v. Pension Benefit Guarantee Corp.*,
    446 U.S. 359 (1980) .................................................... 3

*Pension Benefit Guarantee Corp. v. Morgan Stanley
    Investment Management Inc.*,
    712 F.3d 705 (2d Cir. 2013) ...................................*passim*

## Cases—continued

*Pension Benefit Guarantee Corp. v. R.A. Gray & Co.,*
467 U.S. 717 (1984) ..................................................................... 3

*Perkins v. United Surgical Partners International, Inc.,*
2024 WL 1574342 (5th Cir. 2024) ............................................ 47

*Rinehart v. Lehman Bros. Holdings Inc.,*
817 F.3d 56 (2d Cir. 2016) .................................................... 33, 34

*Rush Prudential HMO v. Moran,*
536 U.S. 355 (2002) .................................................................... 4

*Sacerdote v. New York University,*
9 F.4th 95 (2d Cir. 2021) ...................................................... 22, 24

*Plutzer ex rel. Tharanco Group, Inc. v. Bankers Trust Co. of
South Dakota*, 2022 WL 17086483 (2d Cir. 2022) ...................... 23

*Tussey v. ABB, Inc.,*
746 F.3d 327 (8th Cir. 2014) ...................................................... 44

*Varity Corp. v. Howe,*
516 U.S. 489 (1996) .............................................................. 3, 20

*Wehner v. Genentech, Inc.,*
2021 WL 507599 (N.D. Cal. 2021) ............................................ 48

## Statutes and Rules

29 U.S.C.
§ 1002(34) .................................................................................. 6
§ 1104(a)(1)(B) ........................................................................ 4, 5

Fed. R. Civ. P. 8 ................................................................ 16, 19, 20

## Other Authorities

H.R. Rep. No. 96-869 (1980)............................................................ 5

*Helping Workers Save For Retirement: Hearing Before the S.
Comm. on Health, Education, Labor, and Pensions*,
110th Cong. (2008) .................................................................... 45

Robert J. Doyle, *Field Assistance Bulletin No. 2003-03*,
DOL (May 19, 2003) .......................................................... 7, 8, 45

## INTRODUCTION

This appeal arises from the plaintiffs' failed fourth attempt to plead a plausible claim that the defendants breached their fiduciary duties under ERISA. The district court rightly denied leave to file the Third Amended Complaint (TAC) and dismissed the case with prejudice.

The contradictions and glaring gaps in the TAC readily show why:

- The TAC asserts that the fiduciaries of the Montefiore Medical Center 403(b) Plan breached their duties by failing to monitor and control recordkeeping costs. Yet the TAC also alleges that that the Plan renegotiated costs at least twice during the class period, including when switching recordkeepers, resulting in lower fees each time.

- The TAC asserts that the Plan paid "outrageous" and "unreasonable" recordkeeping fees. Yet it also alleges that the Plan paid nearly the same fees as supposedly reasonable comparators and *less* than the comparators and prevailing rate that were alleged in the second amended complaint but conveniently dropped in the TAC.

- The TAC asserts that recordkeeping services are "fungible" and do not vary plan-to-plan based on quality or any other factor. It further alleges that even where services can be customized, additional services come at no added cost. Yet the plan documents incorporated into the TAC show that the Plan selected a number of optional services that were valuable to plan participants, and many of which *did* come at added cost.

- And perhaps most problematic for the plaintiffs, the TAC asserts that the only determinant of a reasonable recordkeeping fees is the size of the plan itself. Yet the TAC's allegations concerning supposedly reasonable comparator plans establishes no such correlation—*none at all.*

At bottom, plaintiffs offer no more than a bald assertion that the Plan overpaid for recordkeeping fees because it used an asset-based fee allocation system.

1

But plaintiffs disavow any contention that asset-based fee arrangements are *per se* imprudent—as they must, given that other courts and the Department of Labor have uniformly rejected such a theory. Without more, the complaint cannot plausibly indicate that the Plan acted other than in the best interests of its participants.

Plaintiffs do not reckon with any of this. Instead, they gripe (without elaboration) that the TAC contains more "detail" and uses "the same sources" as complaints that elsewhere have survived motions to dismiss. That misses the point: A plaintiff's obligation is not to plead "details," but rather to plead facts that plausibly support an inference of wrongdoing. Details concerning *innocent* facts aren't helpful to plaintiffs. The price of admission to civil discovery is a coherent, plausible theory of wrongdoing—something plaintiffs have failed to marshal after several attempts. Enough is enough.

## ISSUES PRESENTED FOR REVIEW

Whether the district court correctly denied leave to file the TAC where the proposed complaint included self-contradictory allegations concerning key facts and all around failed to plausibly allege a violation of ERISA based on defendants' recordkeeping fees.

## STATEMENT OF THE CASE

The facts presented below are taken from the proposed TAC and the district court's opinions. Appellees assume but do not concede the truth of these

facts. *See, e.g.*, *McCarthy v. Dun & Broadstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (under Rule 12(b)(6), courts must "accept as true all [well pled] factual statements alleged in the complaint").

### A.    Legal background

ERISA is a "comprehensive and reticulated statute" designed "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Pension Benefit Guarantee Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984) (quoting *Nachman Corp. v. Pension Benefit Guarantee Corp.*, 446 U.S. 359, 361-362 (1980)).

When Congress enacted ERISA, it "did not require employers to establish benefit plans." *Conkright v. Frommert*, 559 U.S. 506, 516 (2010). Rather, to promote the availability and sustainability of pension plans, ERISA represents a "'careful balancing' between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." *Id.* at 517 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 215 (2004)).

In enacting ERISA, Congress "repeatedly expressed [its] intent to encourage the maintenance of pension plans." *Nachman*, 446 U.S. at 385 n.35. One of the driving "congressional purposes" was to ensure that plans' "litigation expenses" would not "unduly discourage employers from offering [ERISA] plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497

3

(1996). ERISA "induc[es] employers to offer benefits by assuring a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." *Rush Prudential HMO v. Moran*, 536 U.S. 355, 379 (2002).

ERISA imposes a duty on fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). This Court has explained that the "prudent-man standard" charges fiduciaries with four interrelated obligations:

> ***First***, fiduciaries must act for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan. ***Second***, fiduciaries must use the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ***Third***, fiduciaries must diversify the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so. ***Fourth***, fiduciaries are required to discharge their duties in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with other provisions of ERISA.

*Pension Benefit Guarantee Corp. v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 715-716 (2d Cir. 2013) ("*PBGC*") (cleaned up, citations omitted, and emphasis added).

4

"The duty of prudence mandated by § 1104(a)(1)(B) 'is measured according to the objective prudent person standard developed in the common law of trusts.'" *Id.* at 716 (quoting *La Scala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007). The standard "requires prudence, not prescience." *Id.* (quoting *Debruyne v. Equitable Life Assurance Society of the U.S.*, 920 F.2d 457, 465 (7th Cir. 1990)). Congress knew that fiduciaries must make consequential decisions against a backdrop of market uncertainty, and to accommodate "competing considerations," including administrative efficiency, "financial soundness." H.R. Rep. No. 96-869, at 67 (1980). Because "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, . . . courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Northwestern University*, 595 U.S. 170, 177 (2022).

## B.   Factual background

**1.** Montefiore Medical Center is a premier academic health system renowned for pushing the boundaries of medical science, "from research to discoveries of life-saving cures, from innovations in patient care, to advancements in public health, and to world-class medical education." Montefiore Einstein (visited Aug. 27, 2024), perma.cc/SEE9-554L. The Montefiore Health System provides healthcare services to more than two million people in the Bronx and Westchester County. App. 266 (¶ 20).

Not just a large healthcare provider, Montefiore also is a large employer. It has thousands of employees, including doctors, nurses, and staff. As one of the benefits it offered to employees, the Medical Center created, operates, and oversees the Montefiore Medical Center 403(b) Plan (the Plan). App. 266 (¶¶ 20, 21). The Plan is available to all eligible Montefiore employees. App. 270 (¶ 39). From 2017 to 2022, it had over 22,000 participants (including current and former employees); and at the end of fiscal year 2022, it had over $3 billion in assets under management. App. 261-262 (¶¶ 5, 7).

The Plan is a "defined contribution plan," meaning that it "provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expenses, gains and losses . . . which may be allocated to such participant's account." 29 U.S.C. § 1002(34); App 270 (¶ 39). Employees can contribute to their accounts in a few, defined ways, including annual pre-tax and Roth contributions subject to IRS limitations. App. 271 (¶¶ 41, 42). Montefiore matches a portion of employee plan contributions, between 4% and 10% depending on location, role, and seniority. App. 271 (¶ 42).

The Plan Committee is a named fiduciary under the Plan, which means that it is responsible for selection and monitoring of investments for participants. App. 267 (¶ 28). Montefiore, acting through its board of directors, appointed the Committee to perform these functions. App. 267 (¶ 24).

6

**2.** "In any defined-contribution plan, participants incur certain fees and expenses." *Cunningham v. Cornell University*, 86 F.4th 961, 969 (2d Cir. 2023). This case concerns the "recordkeeping fees" charged to participants by the Plan. "Recordkeeping fees cover necessary administrative expenses such as tracking account balances and providing regular account statements." *Id.* They also cover participant and plan sponsor access (via the phone or internet, for example), payroll services, tax reporting services, plan-level reporting, participant education, consulting, and, of course, basic account recordkeeping (including demographic, investment, and vesting records). App. 275-276 (¶ 62).

There are a number of different recordkeeping fee models. Some recordkeeping fees "are charged either as a flat fee, with each fund participant paying a set amount," or "by 'revenue sharing,' in which the fund pays the recordkeeper a set portion of the fund's expense ratio," *Cunningham*, 86 F.4th at 969-70. Alternatively, plans can charge recordkeeping fees "as a percentage of each participant's account balance." App. 230. Various sources describe flat-fee arrangements as "per capita" or "participant-based" fee models; they describe revenue-sharing and account-balance-based arrangements as "pro rata" or "asset-based" fee models.

In a participant-based structure, participants pay the same fixed amount in administrative fees regardless of the balance in their accounts. *See* Robert

J. Doyle, *Field Assistance Bulletin No. 2003-03*, DOL (May 19, 2003) ("FAB 2003-03"), perma.cc/K3KQ-H72W. In an asset-based structure, participants with greater balances—that is, more money—pay higher fees; those with lower balances pay lower fees. *Id.* ERISA plan documents can specify a fee arrangement, but if they do not, then the plan's fiduciaries "must select the method or methods for allocating plan expenses." *Id.*

The Plan used a fee structure according to which participants paid recordkeeping fees based on the dollars in their individual accounts. App. 286 (¶ 95). Although fees varied from account to account depending on the assets in each, plaintiffs rely on averages, alleging that the cost per participant—the amount paid to the recordkeeper divided by the number of plan participants—varied from $34 to $63 between 2016 and 2022. *Id.*; App. 017.

Plaintiffs allege that a reasonable range of fees was $25 to $30 (App. 287 (¶¶ 99-100)), and that the fees paid by comparator plans were $14 to $31 (App. 288-290). Plaintiffs allege that the asset-based fee that the Plan paid, measured as a function of assets, decreased during the relevant time from 0.073% to 0.037%, then to 0.029%. App. 286 (¶ 95). The SAC previously had alleged that the median rate across similar plans was 0.04% (App. 148 (¶ 108)), although that allegation was conspicuously dropped from the TAC.

During the relevant period, the Plan employed Principal Financial Group and, later, Fidelity Investments as recordkeepers. App. 282 (¶ 85). The Plan's

8

agreements with Principal and Fidelity, which were incorporated by reference in the TAC, show the services selected by the Plan, including numerous "optional" services. App. 028; Dkt. 62 at 27-28.

### C. Procedural background

**1.** Plaintiffs Shiela A. Boyette and Tiffany Jimenez are former employees of Montefiore and participants in the Plan. App. 263-264 (¶¶ 16, 17). Boyette maintained a minimal account balance in the Plan, while Jimenez maintained a balance of approximately $85,000. *Id.*

Plaintiffs originally filed a complaint alleging violations of ERISA's duty of prudence (and its derivative duty to monitor) with respect to the Plan's expense fees and recordkeeping fees. App. 30. Soon thereafter, Plaintiffs filed a First Amended Class Action Complaint. App. 73. After a pre-motion conference on Montefiore's then-forthcoming motion to dismiss, the district court permitted Plaintiffs to amend a second time. They thus filed a third complaint—the Second Amended Class Action Complaint (SAC). App. 117.

The SAC alleged that Montefiore violated its duty of prudence as an ERISA fiduciary because the recordkeeping costs charged by the Plan during the relevant period were too high. App. 230-231. The SAC contained separate claims based on the Plan's "expense ratio," which is the relative cost of the mutual fund investments offered to participants. App. 231. Plaintiffs claimed that the Plan failed to identify and use lower-cost funds, and that it failed to

9

replace "higher cost and underperforming" funds with "superior performing less expensive alternatives." App. 232-233.

**2.** Defendants (appellees in this Court) moved to dismiss. App. 164. They argued that plaintiffs lacked standing, and that the complaint did not allege a plausible breach of any fiduciary duty under ERISA.

**a.** The district court granted the motion and dismissed the SAC under Rules 12(b)(1) and 12(b)(6). App. 227. Beginning with jurisdiction, the court dismissed both the expense ratio and recordkeeping fee claims for lack of standing. On the recordkeeping fees claim, the court held that plaintiffs failed to allege standing because they did not "set[] forth what they individually paid each year in recordkeeping fees," so "they cannot allege that the fees they paid were unreasonable or outside the range of reasonableness set forth in the SAC." App. 237. And on the expense ratio claims, the court held that both Boyette and Jimenez lacked standing because they "did not invest in" the funds they allege "charged excessive expense ratios." *Id.*

**b.** The court dismissed both claims alternatively on the merits, under Rule 12(b)(6). Addressing the recordkeeping fees, the court explained that plaintiffs "must allege more than that the Plan's recordkeeping fees were higher than those of other plans." App. 242. Instead, the fees must be "excessive relative to the services rendered." *Id.* (quotation omitted).

For their part, the plaintiffs had relied only on their "general assertion" that "[n]early all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost." *Id.* But the court held that just because recordkeepers offer the same *range* of services does not mean that "all plans employing a particular recordkeeper receive an identical subset of services within that range." App. 242-243. The plaintiffs thus had "failed to allege with specificity what recordkeeping services the Plan received, [and to] plead that the services provided by the recordkeepers for the comparator plans were the same as those provided by the Plan's recordkeepers." App. 243. The court thus held that the recordkeeping-fee claim had to be dismissed under Rule 12(b)(6). *Id.*

The court also held that plaintiffs failed to plead their cost-of-fund claims "for similar reasons as the plaintiffs' recordkeeping argument." *Id.* While some of the alleged funds were more expensive, the Plan's Form 5500s explained that "the plan received revenue sharing from four of the five more expensive class shares and that such proceeds were credited back to participants investing in those funds." App. 244. There was thus "no question that the plaintiffs received a benefit from the higher cost share classes." *Id.* And with respect to their replacing-underperforming-funds claim, the plaintiffs "fail[ed] to provide any basis beyond underperformance from which imprudence can allegedly be inferred." App. 245. The court rejected plaintiffs'

11

attempts to rely on an expert's assessment at the motion to dismiss stage as procedurally improper and wholly conclusory. App. 246-249.

The district court thus dismissed the SAC "without prejudice," while requiring plaintiffs to file a motion for leave to file the TAC. App. 250.

**3.** Plaintiffs sought leave to file their fourth complaint—the TAC—and attached the proposed TAC to their motion. App. 251, 260. The TAC pressed only the recordkeeping-fees claim and dropped the cost-of-fund claim concerning expense ratios.

Montefiore opposed the motion for leave to file the TAC (App. 299), arguing that the revised complaint continued to reflect the same deficiencies as before, making amendment futile.

The district court denied leave to file the TAC. As the district court explained, the TAC "repeats the bulk of the allegations from the [SAC]." App. 014. In both versions of the complaint, plaintiffs alleged that the cost of recordkeeping services typically depends on the number of participants in the plan, and that larger plans are able to take advantage of economies of scale to obtain lower prices. App. 016.

Correcting for several mathematical errors that had appeared in the SAC, the TAC alleged that the Plan paid a "per-participant" recordkeeping fee ranging between $34 and $63 during the relevant period. App. 017; App. 268. This was a "dramatic" reduction in fees that were alleged in the SAC, so much

so that the Plan's alleged fees fell *within* the range of comparators suggested in the earlier complaints. App. 028. Undeterred, plaintiffs provided a new list of comparators to achieve a narrower fee range, and then alleged that these recalculated fees still are higher than those of the newly curated set of peer plans. App. 016; App. 288.

The district court first held that the TAC partially remedied the standing deficiencies present in the SAC. App. 022. Boyette continued to lack standing because her admitted payment of only a "minimal" recordkeeping fee "failed to allege any injury in fact, let alone one that is 'concrete and particularized.'" App. 264 (¶ 16); App. 023. But the TAC alleged that Jiminez "maintained an account balance of approximately $85,000" in 2018, which resulted in a "payment of, at least, $31" that year. App. 246 (¶ 17). The court held this allegation, together with an allegation that the fee was excessive, was sufficient to confer standing, reserving review of the alleged unreasonableness of that fee amount for the merits. App. 024-025. Finally, the court rejected plaintiffs' attempt to assert standing based on a "derivative claim." App. 027.

On the merits, the court held that the TAC failed to state a plausible claim. The TAC identified eight plans of allegedly "similar size as of 2021 which would require similar recordkeeping services as the Plan." App. 287 (¶ 102). And it alleged that "the Plan was paying higher fees than its peers for the same services." *Id*. But the district court held that the TAC once again

failed to plead whether the "services provided by the recordkeepers for the eight comparator plans were the same as those provided by the Plan's record-keepers." App. 027. On that front, the court observed that the TAC backed off the SAC's reliance on Form 5500 codes—which plaintiffs admitted could be subjective and lacked a consistent methodology (App. 288 n.15)—to identify specific services being provided by the other plans' recordkeepers. *Id.*

Moreover, although the eight comparators ranged from 17,652 to 51,325 participants and from $374 million to nearly $10 billion in assets, the court noted that the TAC "offer[ed] no alternative plan that has a comparable number of participants or assets under management as the Plan, which had at least 22,000 participants and over $2 billion [] in assets under management during the class period." *Id.* The court thus held that the TAC still lacked "the requisite 'apples to apples' comparison required." App. 028.

The court once again rejected plaintiffs' attempt to rely on generalized allegations "that all recordkeepers offer the same range of services." *Id.* (quoting App. 273 (¶ 51)). As the court explained, the plan documents indi-cated that the service agreements between the Plan and the recordkeepers "in-cluded all of the optional services." App. 028. But the TAC did not address whether the supported comparator plans also selected and paid for the same optional services. Without valid comparisons to plans purchasing similar recordkeeping services, plaintiffs had not stated a claim. *Id.*

14

Additionally, the court observed that plaintiffs "dramatically reduced their allegation of the actual recordkeeping costs paid," by more than $100 per participant. *Id.* Plaintiffs continued to allege that "the Plan should have been able to obtain per participant [recordkeeping] fees of $25-$30," which they deemed "the reasonable amount." App. 287 (¶¶ 99, 100). But the revised participant average estimates in the TAC were far lower than those in the SAC, and the complaint alleged that Jimenez herself had paid just $31 in record-keeping fees in 2018. App. 028. The district court held that that figure "would not make the fees charged by the Plan unreasonably excessive" as a matter of law, "particularly because the services provided, as indicated in the plan doc-uments, included all of the optional services." App. 028.

Finally, the court held that the failure to monitor claim is derivative of the duty of prudence claim. *Id.* It concluded that plaintiffs' failure to remedy the errors underlying the earlier dismissal of the SAC rendered the TAC futile and denied leave to file. App. 028-029.

## SUMMARY OF THE ARGUMENT

Following plaintiffs' multiple failed attempts to file a viable complaint, the district court rightly rejected the proposed TAC for failure to state a plau-sible ERISA violation based on recordkeeping fees.

**I.A.** ERISA makes fiduciaries who breach their duties civilly liable under the same basic pleading rules as apply in any other civil lawsuit. Rule 8, construed through the lens of the Supreme Court's decisions, applies.

To be sure, Rule 8 permits a plaintiff to allege violations based on circumstantial evidence, and a plaintiff need not rule out every possible alternative explanation for an alleged harm. But none of that relieves the plaintiff of his obligation to plead facts that give rise to a plausible inference of misconduct. Enforcement of that standard in ERISA cases is especially important, given the vast and asymmetric discovery burdens that can quickly push even an innocent benefit plan to settle even thin claims, driving up the cost of providing benefits and making it less likely that employers will offer benefits in the first place.

**B.** Plaintiffs' third amended complaint does not clear the Rule 8 hurdle. The TAC contains numerous specific allegations that undercut plaintiffs' more general allegations of harm and violation. Plaintiffs allege, for example, that defendants failed to monitor or renegotiate prices—but the complaint shows that Montefiore changed recordkeepers and negotiated lower record-keeping fees during the relevant period. They allege conclusorily that plan participants paid unreasonable fees—but they give examples only of participants who paid fees nearly within their own reasonable range. To avoid that obvious problem, they cut their prior list of comparator plans from the SAC to the TAC,

so as to artificially depress the range of "reasonable" fees. And in all events, the complaint's allegations undermine plaintiffs' foundational assumption, that plan size is the sole determinant of recordkeeping fees.

**C.** Plaintiffs' entire claim rests on an inference of imprudence based on circumstantial evidence—allegations that the Plan overpaid for services. But plaintiffs have failed to plausibly allege that the Plan actually overpaid relative to the services it received. The plan documents below showed that the Plan selected and paid for a number of individualized services not included in the standard bundle of services recordkeepers provide. This specific evidence belies plaintiffs' claims that their chosen comparators used the same services as the Plan. And in any event, those comparators were otherwise dissimilar to the Plan, undermining their utility. Finally, plaintiffs' reliance on a discovery stipulation from another case, addressing different services provided to a different plan, is completely irrelevant to this case—as the great majority of courts to consider that stipulation have recognized.

**II.** Given plaintiffs' failure to establish a violation of the duty of prudence, their duty to monitor claim fails as well.

## ARGUMENT

ERISA plaintiffs bear a straightforward burden: to plead facts that, if proved, would show that "an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*,

712 F.3d at 718 (quoting *In re Citigroup ERISA Litigation*, 662 F.3d 128, 141 (2d Cir. 2011)). As the district court recognized, the plaintiffs here failed to clear that threshold.

The opening brief cites several other cases that survived motions to dismiss based on assertedly similar allegations. But it is remarkably short on what the allegations in *this* case show. Contrary to plaintiffs' assertions, the other cases on which they fixate involved starkly different allegations that offered far more than the high-level, conclusory allegations of the TAC here. Indeed, the TAC time and time again contradicts plaintiffs' own theory of liability. Rather than alleging imprudent inattention, the TAC alleges that the Plan routinely renegotiated its recordkeeping fee as the plan grew and fees rose. Rather than alleging fees unreasonably above the typical range, the TAC's assertions show that the Plan was paying rates below the nationwide median and not significantly higher than its alleged (but actually larger) peers.

At bottom, the TAC's theory of liability turns principally on the assertion that plan size is the primary determinant of fees. But the TAC's allegations show that fees are hardly correlated with plan size at all, and that the Plan here selected a variety of optional services offered by the recordkeeper that may or may not have been reflected in the comparator rates.

It is blackletter law that the Court need not accept "general allegations that are contradicted by more specific allegations in the [c]omplaint." *DPWN*

*Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-152 (2d Cir. 2014). That leaves the Court with a bare assertion of liability, without any of the factual development necessary to make that assertion plausible. Plaintiffs are not entitled to discovery just because they wrote a 124-paragraph, 38-page complaint. Holding plaintiffs to Rule 8's plausibility standard is not to adopt any "heightened" rule of pleading—it is simply to hold the plaintiffs to the bare minimum that the Supreme Court and this Court have required for putting defendants like Montefiore on notice of the claims against them. And it does not impose any barrier to future claims where a thorough investigation actually does uncover facts suggesting liability.

## I.   THE TAC FAILED TO ALLEGE A PLAUSIBLE BREACH OF ERISA'S DUTY OF PRUDENCE

The district court correctly held that—despite multiple attempts—plaintiffs failed to allege facts coherently suggesting an ERISA violation. This was a narrow, context-specific application of the simple and well-settled pleading rule applied in every civil case.

### A.   Plaintiffs in ERISA actions must satisfy the standard Rule 8 pleading requirements as described in *Iqbal* and *Twombly*

Throughout their brief (*e.g.* at 19, 33, 35, and 39), plaintiffs accuse the district court of applying a "heightened" pleading standard or of misapplying its obligation to accept well pleaded allegations and draw reasonable inferences in their favor. That is wrong.

**1.** The Court has held in clear terms—and rightly—that ERISA cases are governed by the "two-pronged" approach of *Twombly* and *Iqbal*, just like any other civil case proceeding under Rule 8. *PBGC*, 712 F.3d at 717.

First, a complaint must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Such statements are not factual allegations to be assumed true, but legal conclusions that must be disregarded. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

Second, if a complaint contains well-pleaded factual allegations, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Plausibility does not require a minimum probability of success, but it does require "more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* at 718. Conduct that is equally consistent with legal conduct is not plausibly indicative of unlawful conduct. That is to say, the mere *possibility* of a breach of a legal duty is not enough. *Id.*

This framework is especially apt in ERISA cases. One of Congress's principal concerns with ERISA was that "litigation expenses" would "unduly discourage employers from offering [benefits] in the first place. *Varity Corp.*, 516 U.S. at 497. As the Court has recognized, "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the

ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *PBGC*, 712 F.3d at 719.

And discovery in ERISA cases is nearly always asymmetric, placing far greater burdens on defendants and producing great pressure for them to settle. While discovery is appropriate in well-plead cases, the asymmetry of the burden in ERISA cases "elevates the possibility that 'a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the discovery process will reveal relevant evidence.'" *Id.* (quoting *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 347 (2005)).

Rules 8 and 12, as interpreted in *Twombly* and *Iqbal*, "help 'to prevent settlement extortion—using discovery to impose asymmetric costs on defendants in order to force a settlement advantageous to the plaintiff regardless of the merits of his suit.'" *Id.* (quoting *Am. Bank v. City of Menasha*, 627 F.3d 261, 266 (7th Cir. 2010)). ERISA claims "call[] for particular care in applying this two-pronged inquiry in order to ensure that the Amended Complaint alleges *nonconclusory* factual content raising a *plausible* inference of misconduct and does not rely on 'the vantage point of hindsight.'" *Id.* at 718 (quoting *In re Citigroup*, 662 F.3d at 140). Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" in ERISA cases, to "divide the plausible

sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

ERISA plaintiffs bringing plausible claims will clear this hurdle. "[A] claim alleging a breach of fiduciary duty may . . . survive a motion to dismiss if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged'" that an ERISA fiduciary violated the relevant duty. *PBGC*, 712 F.3d at 718. A plaintiff need not "rule out every possible lawful explanation for the conduct he challenges." *Sacerdote v. New York University*, 9 F.4th 95, 108 (2d Cir. 2021). But a plaintiff must offer more than facts and circumstances that are equally "in line with a wide swath" of legal conduct. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Rule 12 requires dismissal "when fiduciary defendants [can] offer an alternative explanation for their conduct that is 'obvious,' 'natural,' or simply 'more likely' than the plaintiff's theory of misconduct." *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024).[1]

---

[1]  Plaintiffs rely heavily on *Sacerdote*, even implying (at 26) that all pleading-standard cases that predate it have been abrogated. *See* Opening Br. 26. That is wrong. This Court's statement in *Sacerdote* that plaintiffs need not rule out every possible lawful explanation merely repeats the settled rule that an allegation that is "not only compatible with, but indeed was more likely explained by, lawful . . . behavior" fails to state a claim. *Iqbal*, 556 U.S. at 680; *see also Twombly*, 550 U.S. at 554 (similar). And there can be no doubt that courts are to apply "the pleading standard discussed in [*Iqbal*] and [*Twombly*]" in ERISA cases. *Hughes*, 595 U.S. at 177.

Moreover, a plaintiff's claim of liability may be undermined by more specific allegations in a complaint. *DPWN Holdings*, 747 F.3d at 151-152; *cf. Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."). This Court has not hesitated to affirm the dismissal of ERISA claims where details in the complaint sufficiently undermine the plaintiff's claimed harms. *E.g.*, *Plutzer ex rel. Tharanco Group, Inc. v. Bankers Trust Co. of South Dakota*, 2022 WL 17086483, at *2 (2d Cir. 2022).

**2.** That is the pleading standard that the district court applied. The court explained that it evaluated the TAC "accepting as true all non-conclusory factual allegations therein, and drawing all reasonable inferences in plaintiff[s'] favor." App. 021 (quoting *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017)). It noted that it would not have denied leave to amend if the TAC "had stated 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). And it quoted *Iqbal* for the proposition that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." App. 021-022 (quoting *Iqbal*, 556 U.S. at 678.

As we demonstrate in the following sections of this brief, the district court faithfully applied that pleading standard to the TAC. It accepted as true the TAC's well-plead factual allegations but did not defer to its legal conclusion or statements that were contradicted by plaintiffs themselves. Nothing about the ERISA context—or *Sacerdote*—requires courts to credit naked assertions of wrongdoing or to infer misconduct where conflicting allegations in the complaint render lawful explanations at least as likely.

In the end, the "price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *PBGC*, 712 F.3d at 719 (quoting *DM Research, Inc v. College of American Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999)). Conclusory or contradicted allegations "are a danger sign that the plaintiff is engaged in a fishing expedition," either for evidence or an undue settlement. *Id.* Just so here.

### B. Plaintiffs' own allegations contradict their claims

Plaintiffs devote almost their entire brief to a gripe that "[t]he TAC provides the *types* of circumstantial evidence found to be sufficiently inferential by courts within this Circuit and around the nation." Opening Br. 27; *see also id.* at 28, 29, 30, 31. 32, 33, 36, 37, 42-43, 45. The nub of their argument before this Court is that because the TAC "adds more specifics than other complaints that have been upheld under similar circumstances," they simply

24

*must be* entitled to discovery. *Id.* at 37. But the question presented in this appeal is not whether "the TAC is materially similar to, and even more robustly pled than, other complaints." *Id.* at 45. The question is whether the "details" alleged are more consistent with unlawful conduct than innocent conduct. They are not. In fact, the complaint's specific and "detailed" allegations undermine plaintiffs' claims rather than support them.

### 1. *The TAC alleges that the Plan didn't renegotiate its recordkeeping fees, but then says otherwise*

The key issue in this suit is whether Montefiore acted prudently. *See PBGC*, 712 F.3d at 718. But the few direct allegations about Montefiore's processes are entirely conclusory. The TAC alleges, for example, that "there is little to suggest that Defendants conducted a [request for proposal] at reasonable intervals" (App. 283 (¶ 88)) and that defendants "fail[ed] to make decisions regarding the Plan's [recordkeeping] fees" (App. 293 (¶ 113)).

On their own terms, such allegations are nothing but bare legal conclusions: Defendants did not behave reasonably or make decisions they were required to make. But worse than that, they also are directly contradicted by the allegations plaintiffs themselves included in the TAC. Those allegations show that defendant *did* keep an eye on and continually renegotiate the recordkeeping fees they paid on participants' behalf.

For instance, plaintiffs rely (at 12-13) on a chart reproduced from the TAC (at App. 286) which they argue provides an estimate of the "Average Cost Per Participant" for the plan between 2016 and 2022. They conclude from the chart that, because recordkeeping fees increased at certain points, Montefiore failed to "investigate[], discover[], and implement[]" changes to the plan that would have lowered these costs. Opening Br. 13.

But even a cursory glance at the chart belies the assertion. First, because the Plan allocated fees based on participants' plan assets, an "average" figure says next to nothing about how many participants actually paid how much in fees. But even taken at face value, plaintiffs' chart is of no help to them. Plaintiffs allege that the average cost per participant in 2016 was $43. App. 286 (¶ 95). That figure increased to $46 in 2017. *Id.* In both years, the asset-based fee (the rate at which the recordkeeping costs were calculated), was maintained at 0.073%—meaning that the plan participants paid $0.00073 for every dollar in their accounts. But the next year, the Plan changed recordkeepers and renegotiated the asset-based fee. Rather than 0.073%, the Plan paid *half* that— just 0.037%—in 2018, producing an average per-participant cost of $34. *Id.* The average fees increased over the next three years, reaching $63 in 2021 (in part because the Plans' participant number decreased from more than 25,000 to 22,958), while the asset-based fee remained static. But in 2022, the Plan again negotiated a decrease in the recordkeeping fee—this time to 0.029%. *Id.*

26

Thus, the Plan saw an additional one-third decrease in the average per-participant recordkeeping fee to $41.

Plaintiffs' chart, then, shows that defendants *did* monitor the Plan's per-participant recordkeeping fees and *did* renegotiate the rate (and even changed its recordkeeper) at several points in the 7-year period covered by the complaint. It contradicts a core premise of their theory—*i.e.*, that "no RFPs, negotiations, or other proactive measures were conducted by Defendants here." Opening Br. 16. Plaintiffs do not acknowledge, let alone attempt to explain, this glaring contradiction anywhere in their opening brief. In short, plaintiffs' own allegations show the exact opposite of the supposed imprudence they assert: that defendants did take "proactive measures" to control recordkeeping costs, leading to materially lower fees over time.

In that way, this case is on all fours with *Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1156 (10th Cir. 2023). There, the complaint stated that RFPs should "happen at least every three to five years as a matter of course," and implied that the plan there had failed to conduct the requisite RFPs. *Id.* at 1156-57. But, the Tenth Circuit held, "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval." *Id.* at 1157. And there, as here, there was "no question" that the plan "regularly re-negotiated their fee arrangement with Fidelity, resulting in lower costs for participants." *Id.* at 1156. "Simply alleging the Committee needed to conduct regular RFPs

does not raise a plausible inference of imprudence" in light of the clear evidence of their active monitoring and renegotiating of recordkeeping fees. *Id.*

When "the allegations of the Complaint are materially inconsistent with the sole [claim] Plaintiffs have submitted," the Court can "easily conclude that Plaintiffs' claims lack the facial plausibility necessary to survive a motion to dismiss." *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013); *cf. DPWN Holdings*, 747 F.3d at 151-152 (a court need not accept as true a plaintiff's general allegations if they are contradicted by more specific allegations in the same complaint). That is the case here: Plaintiffs pled themselves out of court by contradicting their own theory of liability. The opening brief gives no ground to doubt that the district court was right to so hold.

### 2. *The TAC alleges that the Plan paid unreasonable recordkeeping fees, but then says otherwise*

Beyond their self-contradictory claim that Montefiore failed to negotiate its recordkeeping rates, plaintiffs suggest that the Court should infer a failure of the duty of prudence because "the amounts paid for recordkeeping were outrageous." Opening Br. 16. But, once again, more specific allegations in the TAC contradict the assertion that the Plan's recordkeeping fees were unreasonable (App. 264 (¶ 17)). As the district court rightly held, the actual figures alleged in the complaint "would not make the fees charged by the plan unreasonably excessive" in light of "the 'reasonable' range of per-participant

recordkeeping fees" that the TAC asserts. App. 028 (citing TAC ¶¶ 99-100).

**a.** The starting point is the TAC itself. Plaintiffs provide only two concrete allegations concerning costs paid by actual plan participants, as opposed to averages. Boyette, who maintained a minimal plan balance, paid a "minimal" recordkeeping fee, essentially near zero. App. 264 (¶ 16). The opening brief does not contend that the fees she paid (if she paid any at all) were unreasonable. *Id.*

Jiminez is alleged to have paid $31 in 2018, which plaintiffs allege "is well above the reasonable rate for recordkeeping fees alleged herein." App. 264 (¶ 17). But the obvious problem is that $31 is *not* "well above the reasonable rate for recordkeeping fees alleged" in the TAC. Rather, it is only $1 above the $25-$30 range that plaintiffs themselves conclusorily suggest would be reasonable. App. 287 (¶ 99).[2]

The asserted "comparator" plans do not help Jiminez's case. One of the examples is the General Dynamics Corporation 401(k) Plan 6.0, which is substantially larger than the Plan here, both in assets and participants. App. 288 (¶ 102). That plan is alleged to use the same recordkeeper (Fidelity) as the

---

[2]   It bears noting that the TAC admitted that the relative rates paid were negotiated downward over time, and common sense suggests that Jiminez's account balance has not sat statically at $85,000 each year—leaving the impression that the $31 fee alleged for 2018 was the most that Jiminez paid (else why not allege a larger number in some other year?).

Plan here. *Id.* And by plaintiffs' own calculations, participants in that plan are paying $31 per participant in recordkeeping fees (*id.*)—exactly what Jiminez is alleged to have paid in 2018.

In any event, a mere one-dollar difference (less than 3.5% above plaintiffs' made-up reasonable range) is not so great that it suggests imprudence. "[T]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S. at 177. Given the flexibility that this standard demands—alongside the TAC's own assertion of what a reasonable fee would be—the plaintiffs' contention that a $31 recordkeeping fee is "outrageous" and "well above" what a prudent fiduciary would pay is indefensible. The district court was thus correct to hold that plaintiffs failed to present circumstantial facts plausibly suggesting a breach of the duty of prudence. App. 028.

**b.** Beside the bright and flashing inconsistencies in the TAC itself, plaintiffs' allegations of unreasonable fees are belied by allegations they originally included in the SAC (but dropped after it was dismissed).

As a starting point, a plaintiff "cannot benefit from amending her complaint to omit [her– earlier] admissions" when those allegations turn out to be unhelpful to her claims. *Austin v. Forder Models, Inc.*, 149 F.3d 148, 155 (2d Cir. 1998), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534

U.S. 506 (2002). Applying this holding, courts in this Circuit have rightly recognized that "[a] plaintiff cannot salvage an implausible claim . . . merely by deleting factual allegations that undermine [it]." *Jones-Cruz v. Rivera*, 2022 WL 20437017, at *11 (S.D.N.Y. 2022). "The amendment of a pleading does not make it any the less an admission of the party." *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 707 (2d Cir. 1989).

In the SAC, plaintiffs alleged in clearcut terms that "the median plan with over 15,000 participants paid [recordkeeping fees of] no more than .04% of plan assets." App. 148 (¶ 108). But when they made that allegation, plaintiffs misunderstood the Plan's Form 5500s and incorrectly believed each participant in the Plan was paying 0.127% of their assets in recordkeeping costs each year. *Id.* That is not so, as plaintiffs were forced to acknowledge in the TAC. In fact, ever since the Plan switched to Fidelity in 2018, it has paid no more than 0.037% in recordkeeping fees, and no more than 0.029% since 2022. App. 286 (¶ 95). A fee of 0.037%, of course, is *less than* the median fee plaintiffs previously alleged was paid by comparable and reasonable plans. Plaintiffs clearly omitted this allegation from the TAC because it fatally undermines their assertion that the Plan's fees were unreasonable. Plaintiffs' notion of "reasonableness" is a moving target, rather than an actual standard.

That is not all. One of the purported comparators plaintiffs put forward in the SAC, the Sanofi U.S. Group Savings Plan, was alleged to be a "plan[] of

a similar size as of 2018" and included to "show that the Plan was paying higher recordkeeping fees than its peers." App. 145 (¶ 105). In fact, the Sanofi plan was the closest in participant size to the Plan here—*i.e.*, it was the most apt comparator based on plaintiffs' own theory. But while the SAC alleged that Sanofi paid $23 in recordkeeping fees in 2018, that figure was based on a mathematical error (as defendants pointed out in their motion to dismiss). *See* App. 179. The Sanofi fee was actually $45 per participant, as simple arithmetic shows (dividing the alleged $1,082,552 recordkeeping fee by the number of enrollees that the SAC alleged were participating in the plan). *Id.* Thus, under plaintiffs' own allegations, both Jiminez (who paid $31 in 2018) and the Plan (which allegedly paid an average of $34 per participant in 2018) paid less than one of the peer firms that is allegedly a model of prudence. And so, plaintiffs simply deleted the Sanofi plan from the TAC.

But even more to the point, because the allegedly "reasonable" fee range is based on plaintiffs' cherry-picked comparators, correcting their mathematical error would yield an actual "reasonable" range of $25-$45. That again defeats their claim: Plaintiffs allege that the Plan paid $45 or less in four of the seven years at issue and, looking at the full seven-year period, paid an average of just barely above that—$46.85. App. 286 (¶ 95).

Courts must "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes*, 595 U.S.

at 177. That "range" cannot plausibly have sharp edges, but instead covers a spectrum of reasonable decisions available to plan administrators. Given plaintiffs' own allegations, the Plan can hardly be said to be paying unreasonable recordkeeping fees, even under plaintiffs' own view of the facts.

**3.** Rather than attempt to defend their allegations of unreasonableness, plaintiffs argue (at 34-35) that, in failing to credit their bald conclusion that the Plan's recordkeeping fees were unreasonable, the district court "improperly discerned what a reasonable fee is and the weight of plans services." Setting aside that reasonableness is a *legal* standard, the Supreme Court has explained that in "[d]etermining whether a complaint states a plausible claim for relief," a court must "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. No court is required to credit general allegations that are both conclusory and elsewhere contradicted. In light of plaintiffs' own assertions, it was not error for the district court to reject plaintiffs' unadorned claim that the fees were unreasonable—it would have been error not to.

Nor is there anything to plaintiffs' suggestion that rejecting their conclusory assertion of reasonableness is out of step with settled practice. Courts (including this one) have consistently assessed the plausibility of pleadings concerning reasonableness in ERISA cases. In *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 67 (2d Cir. 2016), for example, the Court considered allegations concerning the reasonableness of certain investments. It observed

33

that a prudent fiduciary could have had a variety of reasonable motives for not divesting the stock, and that plaintiffs had therefore failed to allege that holding the investment was unreasonable. *Id.* And the Seventh Circuit has held that "courts should not hesitate to dismiss an ERISA claim for breach of the duty of prudence" if "an alternative explanation for an ERISA fiduciary's conduct" is "better supported by the facts than any theory of fiduciary-duty violation pleaded by a plaintiff." *Hughes v. Northwestern University*, 63 F.4th 615, 630 (7th Cir. 2023).[3]

That is this case. Despite plaintiffs' bare allegations, the more specific facts they have alleged paint a picture of an asset-based fee arrangement in which the fiduciaries monitored and regularly renegotiated recordkeeping fees every few years. Unsurprisingly, that course of conduct produced fees within the close vicinity of the fees paid by the allegedly reasonable comparator plans. These fees hardly were "outrageous" or "unreasonable." Instead, the facts alleged in the complaint are "much more likely to be" the result of a fiduciary making decisions within "the range of reasonable judgments a

---

[3] While the Seventh Circuit ultimately held that the allegations in *Hughes* survive a motion to dismiss, the key allegation in that case was that the plan was paying two recordkeepers to do work that could have been done by one. *Id.* at 632. The plaintiffs there provided examples of plans that had saved substantial sums by consolidating from two recordkeepers to one. *Id.* These concrete and direct allegations are far afield from those in the TAC.

fiduciary may make based on her experience and expertise." *Hughes*, 63 F.4th at 630 (quoting *Hughes*, 595 U.S. at 177). The TAC thus failed to plausibly state a claim, and leave to amend was properly denied.

### C. Plaintiffs failed to plausibly allege that the plan overpaid relative to the services it received

The district court was right to dismiss the recordkeeping-fees claim as futile for yet another reason. The basic requirement for plaintiffs in ERISA recordkeeping cases is to plead that "fees are excessive . . . relative 'to the services rendered.'" *Cunningham*, 86 F.4th at 978. "[I]t is not enough to allege that the fees were higher than some theoretical alternative service." *Id.* This rule is a basic extension of the observation that "it is not unreasonable to pay more for superior services." *Id.*

Without allegations concerning the relative content and quality of recordkeeping services provided, it is not possible to infer that any alleged price differential across comparators reflects a lack of diligence, rather than a considered and reasonable choice about the services and fee structures that will best serve participants' needs. Because the district court rightly observed that the TAC failed to provide useful comparators and failed to plausibly allege that price differences were not attributable to differences in services, it was right to deny leave to amend.

### 1. The plan documents contradict the TAC's bald assertion that the services provided were uniform and fungible

The central premise of the TAC is that all recordkeeping services are the same. Plaintiffs' use the word "fungible" both in the TAC and the opening brief (at 10, 38) to convey the idea that recordkeeping is a commodity service that does not vary in terms of the scope or quality offered. The theory, then, is that any deviation in the price paid by a plan from the lowest price paid by any other similarly-sized plan necessarily reflects a lack of diligence and prudence. The TAC and opening brief both are express about this: The scope and quality of services selected "do not affect the amount charged by recordkeepers for such basic and fungible services" (App. 277 (¶ 66)); rather, the "size [of a plan] is the true driver of price" (Opening Br. 38).

But once again, more specific allegations in the complaint utterly undermine this theory of the case. *See DPWN Holdings*, 747 F.3d at 151-152. Plaintiffs' purported comparators demonstrate that size is *not* in fact the primary driver of recordkeeping fees, and the Plan documents here show that the Plan opted for numerous additional and upgraded services from its recordkeeper for which it paid more. The more plausible inference, then, is simply that the Plan chose to pay more for better service—a choice that this Court has held is inherently reasonable. *Cunningham*, 86 F.4th at 978.

**a.** Plaintiffs' theory of the case hinges on their assertion that differences in recordkeeping services do not affect recordkeeping fees, and that the primary factor determining the fees a plan pays is the number of participants in the plan. The TAC itself shows that to be wrong.

The TAC cites eight other plans to show "that the Plan [here] was paying higher [recordkeeping] fees than its peers." App. 287 (¶ 102). Those comparator plans show no correlation between size and the fees paid. Two of the plans—the JBS 401(k) Savings Plan and the Deseret 401(k) Plan—are both alleged to use Great-West as their recordkeeper and to pay $25 per participant per year. *See* App. 288. That is so despite that Deseret has nearly 35,000 participants while JBS has only 19,420—meaning that, under plaintiffs' theory, Deseret should be paying substantially less. *Id.* Kaiser Permanente's plan, which has more than 47,000 participants, is alleged to pay Vanguard nearly 50% *more* per participant in recordkeeping fees than a plan with 41,766 participants—under plaintiffs' theory, the larger plan should be paying less. *Id.* And Fidelity—the current recordkeeper in this case—is alleged to charge Publicis Benefits Connection 401K plan (with 42,316 participants) $28 per participant per year, while it charges the larger General Dynamics Corporation 401(k) Plan 6.0 (with 48,852 participants) slightly more, $31. *Id.*

The comparators plaintiffs chose to include in their own complaint thus undercut their claim that size is all that matters. A simple scatter plot makes

the point impossible to miss. Plaintiffs assert that each of these dots reflects a reasonable recordkeeping fee negotiated by fiduciaries duly exercising their duty of prudence. But these dots show that diligent fiduciaries do *not* achieve lower recordkeeping fees as plan size increases.



Visually speaking, the points do not yield any correlation. Nor do they do so as a matter of basic statistics. Tellingly, the TAC does not allege a correlation coefficient, which can be calculated using simple online tools. "A correlation coefficient . . . measur[es] the strength of the relationship between the dependent and independent variables." *Barnett v. Cirt of Chicago*, 969 F. Supp. 1359, 1415 (N.D. Ill. 1997). The "coefficient may range from 0.0," meaning no correlation, "to +1.0, indicating that the two variables are

perfectly correlated in a positive direction." *Id.*; *see also NAACP, Inc. v. Cirt of Niagara Falls*, 65 F.3d 1002, 1005 n.2 (2d Cir. 1995). A correlation coefficient of 0.11 (which is what the data here bears out) shows essentially *no* correlation.

Without their core assumption—that diligent fiduciaries will achieve lower recordkeeping fees as plan size increases—plaintiffs offer no facts to explain what might actually lead to price differentiations. Without any such explanation, plaintiffs' suggestion that higher prices are necessarily a result of imprudence is nothing but a naked legal conclusion. It certainly is no more plausible than myriad alternative explanations—including that plans pay more for *different* and *better* services.

**b.** Nor can the Court take seriously plaintiffs' assertion that the Plan did not receive different and better services. App. 276 (¶¶ 63-64).

The plan documents—which are expressly relied on and thus incorporated into the TAC (*see Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016)) and which the district court cited at length—show that plans have a wide variety of services to choose from and great flexibility in customizing packages that best serve their participants' needs. The same documents show that the Plan here selected a wide range of optional and individualized services. And, critically, they show that those services were not free. Dkt. 62 at 27-28 (listing "Fees for Optional Services").

For Fidelity, this has meant 46 separate optional services including "virtually 24 hour account inquiry and . . . transaction capabilities, through the automated voice response system and on-line account access via the world wide web," "retirement online planning tools," "calculation services to assist Participants and [the Plan] with determining the maximum legally permissible 403(b) salary deferral contribution amount for the year," a "Financial Wellness Program," "Quarterly check-ins," and "Webcasts and Podcasts." Dkt. 62-1, at 20-23. The Plan's agreement with Fidelity also included an agreement for several on-site representatives. *Id.* at 42. And for Principal (the recordkeeping before Fidelity), that included ten optional services such as "Internal Controls," "Mailing of annual Participant notices," "Hardship Withdrawal Service," and "Special compliance testing." Dkt. 62-2, at 20-22.

The TAC does not allege that it was unreasonable to purchase these options to give participants higher quality services. Nor could it—this Court has squarely held that "it is not unreasonable to pay more for superior services." *Cunningham*, 86 F.4th at 978. Because the incorporated plan documents refute plaintiffs' claim that the Plan received only "fungible" services offered by all recordkeepers to all plans, the district court was right to discount the TAC's comparators. App. 028. Plaintiffs understood their obligation to show that the Plan was not just paying more than the comparators, but that it was

paying more "for the *same services*." App. 287 (¶ 102). Plaintiffs simply have not made that showing.

The Eighth Circuit's decision two weeks ago in *Barrett v. O'Reilly Automotive, Inc.*, 2024 WL 3980839 (8th Cir. Aug. 29, 2024), came to the same conclusion on analytically the same facts. As here, the plaintiffs' "overarching theory [was that, by allowing costs to soar," the plan's fiduciaries violated their duty of prudence. *Id.* at *1. As here, there were no allegations of "any direct mismanagement," and the plaintiffs' case thus "require[d] an inference of mismanagement from the high costs alone." *Id.* The court explained that in such cases, the key is "'a meaningful benchmark' that provides a sound basis for comparison." *Id.* at *2 (quoting *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279-280 (8th Cir. 2022)).

Like the complaint here, the complaint in *O'Reilly* "ha[d] benchmarks, but none [that were] meaningful." *Id.* Just like plaintiffs here, the plaintiffs there had used the "cost figures" from Form 5500s to derive per-participant fees. *Id.* But, like plaintiff here, the plaintiffs there failed to show that the services being provided to the comparator plans were the same as the services provided to the defendant. *Id.* According to the Eighth Circuit, trying to draw inferences from the numbers alleged was "like trying to compare the costs of two otherwise identical grocery baskets, except one contains filet mignon and the other does not." *Id.* Needless to say, one "would expect [the basket] with

41

the steak to cost more, and the same goes for a plan that offers additional individualized services." *Id.*

That is this case to a tee. Plaintiffs fail to take stock of the fact that the plan documents on which they rely show that the Plan selected additional, individualized services. Without being able to show that the comparator plans were receiving the same services, plaintiffs cannot draw *any* reasonable inference by comparison alone, much less one of mismanagement. Without knowing if the services are the same "their approach just doesn't work." *Id.*

### 2. *The complaint fails to provide an apples-to-apples comparator even without considering services*

This Court has said that, in ERISA cases based on recordkeeping fees, plaintiffs "must provide" comparator plans as "'suitable benchmark[s].'" *Cunningham*, 86 F.4th at 982 (quoting *Brotherson v. Putnam Investments, LLC*, 907 F.3d 17, 34 (1st Cir. 2018)). As we have just shown, plaintiffs failed to clear that hurdle here because they have not alleged that the comparator plans used the same or similar services as the Plan. They instead allege that services are "fungible," but the plan documents (and other pled facts) contradict that assertion. It is thus impossible to use the comparator plans as benchmarks. Putting that failure aside, plaintiffs failed to allege viable comparators for two other reasons.

**a.** First, as the district court observed, plaintiffs "offer no alternative plan that has a comparable number of participants or assets under management as the Plan, which had at least 22,000 participants and over $2 billion dollars in assts under management during the class period." App. 027. The TAC contains one comparator with 19,420 participants, but no others between 18,000 and 34,357. App. 288 (¶ 102). And the one comparator reasonably close in size to the Plan had only $374 million in assets under management. *Id.* As we noted earlier, the Sanofi plan included in the SAC was the best fit in size and assets for the Plan—but it paid essentially the same as the Plan did here, so plaintiffs culled it from their comparator list. *See* App. 145 (¶ 105). Plaintiffs have thus failed to provide a comparable plan under the only metrics of size they were considering—rendering it impossible to make an apples-to-apples comparison.

**b.** Second, the TAC contains no allegations addressing whether the comparator plans use an asset-based or a participant-based fee distribution mechanism. Plaintiffs concede that "utilizing a revenue sharing approach is not *per se* imprudent." App. 279 (¶ 73). At the same time, they assume that a Plan must always choose the least expensive recordkeeper, regardless of fee allocation structure. This Court already has rejected that kind of simplistic reasoning. *PBGC*, 712 F.3d at 718. Instead, plaintiffs must show that there were opportunities to save participants appreciable sums of money while also

43

accommodating the fiduciaries' reasonable substantive judgments about Plan management and priorities. *Id.*

There are clear reasons why administrators might select an asset-based fee allocation. Shifting the cost of recordkeeping to richer investors who are more likely to utilize customer-support services is more equitable and avoids a substantial disincentive to young or early investors with small balances. That is why asset-based fee structures are a "common and acceptable investment industry practice[] that frequently inure[] to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

It is therefore sometimes reasonable for a Plan to select an asset-based fee structure, even if it means higher overall fees for some participants. Plaintiffs' allegations, that Boyette paid a "minimal fee" and Jiminez paid at most $31, demonstrate the point. "A flat-fee structure [would] be beneficial for participants with the largest balances, but . . . [would] work out to more, per dollar under management" for "younger employees and others with small investment balances." *Loomis v. Exelon Corp.*, 658 F.3d 667, 672 (7th Cir. 2011). "[F]lat payments per participant may" thus "help some participants but hurt others, depending on the size of each participant's account." *Id.* at 672-673. Plaintiffs themselves would have been among those hurt by a flat-fee approach, stuck paying the same as those with much higher balances.

For decades, the Department of Labor has acknowledged that a method of allocating expenses is not imprudent "merely because the selected method disfavors one class of participants, provided that a rational basis exists for the selected method." FAB 2003-03. "Prudence" in selecting a fee distribution method "require[s] a process by which the fiduciary weighs the competing interests of various classes of the plan's participants and the effects of various allocation methods on those interests." *Id.* DOL has even observed that "a pro rata method of allocating expenses among individual accounts would appear in most cases to be an equitable method of allocation of expenses among participants" *Id.* (parenthetical omitted).

It is thus unclear "why [most] participants would view a capitation fee as a gain." *Loomis*, 658 F.3d at 672. "Such a structure may have the opposite effect of increasing administrative costs by failing to match the pro-rata fee that individual participants could achieve at a lower cost through exercising their investment options in a revenue-sharing structure." *Divane v. Northwestern University*, 953 F.3d 980, 989 (7th Cir. 2020). And those whose fees would increase in a per capita model—including plaintiffs—are the participants with the fewest assets from which to pay the fees.

Forcing plans with asset-based fee structures to switch to a participant-based model would thus force fiduciaries to forego reasonable management objectives. ERISA does not require such a choice. *See Helping Workers Save*

*For Retirement: Hearing Before the S. Comm. on Health, Education, Labor, and Pensions*, 110th Cong. 15 (2008) (statement of Bradford P. Campbell, Assistant Secretary of Labor) (noting the department's "concern[]" that "[r]equiring specific investment options would limit the ability of employers and workers together to design plans that best serve their mutual needs in a changing marketplace.").

Without any consideration of the fee structures employed by the comparator plans or what reasonable management objectives the fee structures were selected to serve, no meaningful comparison is possible. Put another way, plaintiffs' failure to allege, even nakedly, that the comparator plans would have allowed the Plan to meet its other reasonable management objectives deprives the comparators of all use.

**c.** Plaintiffs cite (at 28-30) the Third Circuit's recent decision in *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172 (3d Cir. 2024), in an effort to rehabilitate their comparators. But while the sources of information relied on by the complaints may be similar, the information itself is not. In *Mator*, the Third Circuit credited the plaintiffs' allegations that "all service providers quot[e] fees on a per-participant basis without regard for any individual differences in services requested." *Id.* at 186. Here, by contrast, the plan agreements expressly disprove plaintiffs' similar claim by providing separate fees for optional services. Dkt. 62, 27-28. And in *Mator*, the plaintiffs alleged that

46

the "Plan's fees were *several times* larger than what similar plans paid," total-ing $154 per participant. 102 F.4th at 185, 187 (emphasis added). Here, of course, the difference is far less stark (where it exists at all).

The same goes for the Fifth Circuit's decision in *Perkins v. United Sur-gical Partners International, Inc.*, 2024 WL 1574342 (5th Cir. 2024). There, the court found the plaintiffs' complaint sufficient because it "compare[d] the Plan's recordkeeping costs with the costs for *similar recordkeeping services* provided to a *similar number of plan participants*." *Id.* at *5 (emphasis added). Not so here.

### 3. *The Fidelity stipulation is irrelevant according to plaintiffs' own theory of the case*

With little else to go on, plaintiffs point to a stipulation from a different lawsuit, filed in in a different circuit, between different parties, concerning a different plan, and involving allegations of different facts. Opening Br. 17-18, 29, 38; *see Moitoso v. FMR*, No. 18-cv-12122, ECF 138-67 (D. Mass. 2020). The same plaintiffs' lawyers, and other like them, have attempted this gambit in a number of other courts, and they have largely been rebuffed. The district court rightly joined many others in rejecting the relevance of the Fidelity stip-ulation and declining to accept it as circumstantial evidence of wrongdoing. *See, e.g.*, *Barrett*, 2024 WL 3980839, at *3 n.2 ("Nor does the plaintiffs' reli-ance on a discovery stipulation from another case work."); *Mateya v. Cook*

*Group Inc.*, 2023 WL 4608536, at \*6 (S.D. Ind. 2023); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at \*8 (D. Minn. 2022); *Johnson v. PNC Financial Services Group, Inc.*, 2021 WL 3417843, at \*4 (W.D. Penn. 2021); *Wehner v. Genentech, Inc.*, 2021 WL 507599, at \*6 (N.D. Cal. 2021).

The Fidelity stipulation is facially "inapposite" for two reasons. App. 249 n.6. First, the plan in that case "included more than 58,000 participants and $17 billion in assets under management." *Id.* It was thus more than twice the size of the Plan in terms of participants and *five times* the size in terms of assets. On Plaintiffs' own theory of the case (that plan size is the sole determinant of recordkeeping costs), the stipulation is irrelevant. Plaintiffs' unexplained assertion that "the Plan's demographics matches favorably with the Fidelity plan's demographics" is simply wrong. App. 292 (¶ 108).

*Second*, and once again, plaintiffs fail to allege anything about the types and quality of services Fidelity provided to *its own plan*. No reasonable inference can be drawn from the stipulation itself on this front. The parties in the District of Massachusetts stipulated that "[t]he Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period." App. 291 (¶ 107). But the parties did not say that all plans using Fidelity as a recordkeeper received the *same* services, and they did not foreclose the possibility that Fidelity received *less* valuable

48

services from Fidelity than some other plans—which would readily explain the lower recordkeeping fees in that case. Fidelity itself later clarified that the stipulation "certainly does not reflect the value of the recordkeeping services that Fidelity provides to different plans pursuant to different recordkeeping contracts for a different set of services." *Harmon v. Shell Oil Co.*, No. 3:20-cv-21, ECF 134 (S.D. Tex. 2021).

## II. THE FAILURE TO MONITOR CLAIM FAILS BOTH INDEPENDENTLY AND AS A DERIVATIVE CLAIM

As the plaintiffs acknowledge (and the district court rightly held), the failure to monitor claim is derivative of the duty of prudence claim. *See, e.g.*, *Coulter v. Morgan Stanley & Co., Inc.*, 753 F.3d 361, 368 (2d Cir. 2014) ("Plaintiffs' latter two claims—failure to monitor and breach of co-fiduciary duty—constitute derivative claims that cannot survive absent a viable claim for breach of a duty of prudence."). "Because the underlying duty of prudence claim fails," so too does plaintiffs' duty to monitor claim. *Id.*

## CONCLUSION

The Court should affirm the district court's denial of leave to amend and its dismissal of the case with prejudice.

September 11, 2024

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly
Charles Seidell
  *McDermott Will & Emery LLP*
  *500 N. Capitol Street NW*
  *Washington, DC 20001*
  *(202) 756-8000*

John J. Calandra
  *McDermott Will & Emery LLP*
  *One Vanderbilt Avenue*
  *New York, New York 10017*
  *(212) 547-5400*

*Counsel for Defendants-Appellees*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel for Defendants-Appellees certifies that this brief:

(i)    complies with the type-volume limitation of Rule 32(a)(7)(B)(i) because it contains 11,336 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)   complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it is typeset in Century Supra font in 14 points or larger.

Dated: September 11, 2024                    /s/ *Michael B. Kimberly*

## CERTIFICATE OF SERVICE

I hereby certify that that on September 11, 2024, the foregoing brief was served on all parties or their counsel of record through the CM/ECF system.

Dated: September 11, 2024                    /s/ *Michael B. Kimberly*