# 24-1279

---

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

---

SHEILA A. BOYETTE AND TIFFANY JIMINEZ,
individually and on behalf of all others similarly situated,
*Plaintiffs- Appellants.*

v.

MONTEFIORE MEDICAL CENTER, THE BOARD OF TRUSTEES OF
MONTEFIORE MEDICAL CENTER, THE TDA PLAN COMMITTEE, and
DR. MICHAEL STOCKER, *Defendants-Appellees*
and JOHN DOES 1-30, *Defendants*

---

**Appeal from the United States District Court for the
Southern District of New York**

---

**REPLY BRIEF FOR PLAINTIFFS-APPELLANTS**

---

Mark K. Gyandoh
**CAPOZZI ADLER, P.C.**
312 Old Lancaster Road
Merion Station, PA 19066
Tel: (610) 890-0200
Fax: (717) 233-4103

*Attorneys for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Second Circuit Local Appellate Rule 26.1, Appellants, Sheila A. Boyette and Tiffany Jiminez, make the following disclosure:

(1)    For nongovernmental corporate parties, please list all parent corporations:

*Not applicable.*

(2)    For nongovernmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:

*Not applicable.*

(3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

*Not applicable.*

4)    In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: (1) the debtor, if not identified in the

case caption; (2) the members of the creditors' committee or the top 20 unsecured creditors; and, (3) any entity not named in the caption which is an active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

*Not applicable.*

Dated:  October 2, 2024                              */s/ Mark K. Gyandoh*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................................i

I.    Introduction.................................................................................1

II.    The Plan's Fee History Demonstrates Imprudent Conduct.............................4

III.    Plaintiffs' Services Allegations ....................................................12

IV.    Plaintiffs Allege Meaningful Comparators ...................................19

    A.    The Plans .........................................................................19

    B.    Fidelity's Stipulation is Relevant ........................................22

    C.    The TAC's Amendments ....................................................23

V.    Plaintiff Jiminez Has Sufficiently Alleged Standing ...................................24

VI.    Duty to Monitor ...........................................................................26

CONCLUSION .......................................................................................27

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Armstrong v. LaSalle Bank Nat'l Assoc.,*
446 F.3d 728 (7th Cir. 2006) ...................................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)................................................................................1

*Barnett v. City of Chicago*,
969 F. Supp. 1359 (N.D. Ill. 1997) .........................................................20

*Barrett v. O'Reilly Auto., Inc.*,
112 F.4th 1135 (8th Cir. 2024) ....................................................... 18, 19

*Braden v. Wal-Mart Stores*,
588 F.3d 585 (8th Cir. 2009) ............................................................4, 14

*Bugielski v. AT&T Servs., Inc.*,
76 F.4th 894 (9th Cir. 2023) ...................................................................2

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*,
No. 21-cv-8384, 2024 WL 2815980 (S.D.N.Y. May 31, 2024)............................5, 7

*Cassell v. Vanderbilt Univ.*,
285 F. Supp. 3d 1056 (M.D. Tenn. 2018)...............................................25

*Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*,
502 F.3d 91 (2d Cir. 2007).....................................................................25

*Cunningham v. Cornell University*,
86 F.4th 961 (2d Cir. 2023) ........................................................ 1, 17, 18

*Cunningham v. Cornell Univ.*,
No. 16-cv-6525, 2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017),
*aff'd*, 86 F.4th 961 (2d Cir. 2023)..........................................................18

*Davis v. Salesforce.com, Inc.*,
No. 21-cv-15867, 2022 WL 1055557 (9th Cir. Apr. 8, 2022)................................12

*Dionicio v. U.S. Bancorp*,
No. 23-cv-0026, 2024 WL 1216519 (D. Minn. Mar. 21, 2024)............................14

*Divane v. Northwestern University*,
953 F.3d 980 (7th Cir. 2020) .................................................................................9

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016)....................................................................................15

*Dukes v. AmerisourceBergen Corp.*,
23-cv-313, slip op. (W.D. Ky. Sep. 24, 2024) .......................................................23

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)................................................................................................2

*Garnick v. Wake Forest Univ. Baptist Med. Ctr.*,
629 F. Supp. 3d 352, 364 (M.D.N.C. 2022) .........................................................22

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) .................................................................................8

*Glick v. ThedaCare, Inc.*,
No. 20-cv-1236, 2023 WL 9327209 (E.D. Wis. July 20, 2023)..............................3

*Hughes v. Northwestern University*,
142 S. Ct. 737 (2022) ("*Hughes I*").............................................................. 2, 3, 17

*Hughes v. Northwestern Univ.*,
63 F.4th 615 (7th Cir. 2023) ("*Hughes II*") ....................................................*Passim*

*Kistler v. Stanley Black & Decker, Inc.*,
No. 22-cv-966, 2024 WL 3292543 (D. Conn. July 3, 2024)....................................4

*Kruchten v. Ricoh USA, Inc.*,
No. 23-cv-1928, 2024 WL 3518308 (3d Cir. July 24, 2024) .......................... 14, 17

v

*LaScala v. Scrufari*,
479 F.3d 213 (2d Cir.2007).........................................................................26

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ...................................................................9, 10

*Matney v. Barrick Gold of North America*,
80 F.4th 1136 (10th Cir. 2023) .................................................................8, 9

*Mator v. Wesco Distribution, Inc.*,
102 F.4th 172 (3d Cir. 2024) ................................................................*Passim*

*McDonald v. Lab'y Corp. of Am. Holdings*,
No. 22-cv-680, 2023 WL 4850693 (M.D.N.C. July 28, 2023) .......................22

*Mulligan v. Long Island Univ.*,
No. 18-cv-2885, 2018 WL 8014320 (E.D.N.Y. Dec. 13, 2018)......................17

*Moore v. Humana, Inc.*,
No. 21-cv-232, 2022 WL 20766504 (W.D. Ky. Dec. 2, 2022) .......................17

*N.A.A.C.P. v. City of Niagara Falls, N.Y*,
65 F.3d 1002 (2d Cir. 1995).........................................................................20

*Nat'l Ass'n for Fixed Annuities v. Perez*,
217 F. Supp. 3d 1 (D.D.C. 2016) .................................................................25

*In re Omnicom ERISA Litig.*,
No. 20-cv-4141, 2021 WL 3292487 (S.D.N.Y. Aug. 2, 2021) .......................25

*Parmenter v. Prudential Ins. Co. of Am.*,
93 F.4th 13 (1st Cir. 2024)...........................................................................15

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* (*PBGC*),
712 F.3d 705 (2d Cir. 2013)............................................................. 1, 2, 7, 11

*Perkins v. United Surgical Partners*,
No. 23-cv-10375, 2024 WL 1574342 (5th Cir. Apr. 11, 2024)................. 14, 17

*Ramos v. Banner Health*,
1 F.4th 769 (10th Cir. 2021) ............................................................................*Passim*

*Ricoh*, 2024 WL 3518308 ........................................................................................17

*Ruilova v. Yale-New Haven Hosp., Inc.*
No. 22-cv-00111, 2023 WL 2301962 (D. Conn. Mar. 1, 2023)................... 5, 6, 7, 8

*Sacerdote v. N.Y. Univ.*,
9 F.4th 95 (2d Cir. 2021) ........................................................................ 1, 4, 8, 12

*Sacerdote v. N.Y. Univ.*,
328 F. Supp. 3d 328 (SD.N.Y.) ...............................................................................11

*Sandoval v. Exela Enter. Sols., Inc.*,
No. 17-cv-1573, 2020 WL 9259108 (D. Conn. Mar. 30, 2020).............................11

*Savage v. Sutherland Glob. Servs., Inc.*,
521 F. Supp. 3d 308 (W.D.N.Y. 2021).....................................................................9

*Short v. Brown Univ.*,
320 F. Supp. 3d 363 (D.R.I. 2018) .........................................................................25

*Stengl v. L3Harris Techs., Inc.*,
No. 22-cv-572, 2023 WL 2633333 (M.D. Fla. Mar. 24, 2023)...............................22

*Teodosio v. DaVita, Inc.*,
684 F. Supp. 3d 1117 (D. Colo. 2023).....................................................................22

*Tibble v. Edison Int'l*,
843 F.3d 1187 (9th Cir. 2016) ................................................................................10

*Turner v. Schneider Elec. Holdings, Inc.*,
530 F. Supp. 3d 127 (D. Mass. 2021) .......................................................................6

*Tussey v. Abb, Inc.*,
746 F.3d 327 (8th Cir. 2014) ...................................................................... 9, 10, 19

*In re Unisys Sav. Plan Litigation*,
74 F.3d 420 (3d Cir. 1996)..........................................................................7

*Vellali v. Yale University*,
308 F. Supp. 3d 673 (D. Conn. 2018).................................................7, 11

## Other Sources

Employee Retirement Income Security Act of 1974.......................................*Passim*

Field Assistance Bulletin No. 2003-03, DOL (May 19, 2003)................................10

# I.     Introduction

Defendants' Brief ("Defs. Br.") is based on inapplicable law and a misstatement of the facts. Like the district court, Defendants' scarcely mention *Sacerdote v. N.Y. Univ.*, 9 F.4th 95 (2d Cir. 2021), although *Sacerdote* is precedential and directly on point. Defendants criticize Plaintiffs for "rely[ing] heavily on *Sacerdote"* because "[t]his Court's statement in *Sacerdote* that plaintiffs need not rule out every possible lawful explanation merely repeats the settled rule that an allegation that is 'not only compatible with, but indeed was more likely explained by, lawful . . . behavior' fails to state a claim." Defs. Br. at 22 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009)). Defendants conveniently omit the words "lawful '**unchoreographed free-market**' behavior" from their *Iqbal* quote, which shows that the inadvertent factors in *Iqbal* are inapplicable to the ***intentional*** fiduciary behavior here. *Iqbal*, 556 U.S. at 680. Thus, it is entirely appropriate for Plaintiffs to "rely heavily" on *Sacerdote's* application of *Iqbal* in ERISA cases.

Defendants rely on *Cunningham v. Cornell University*, 86 F.4th 961 (2d Cir. 2023), a summary judgment decision that simply proves that these claims should survive a motion to dismiss. Defendants' other primary support, *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* (*PBGC*), 712 F.3d 705 (2d Cir. 2013), did not involve recordkeeping allegations and poignantly distinguished its holdings from typical ERISA cases such

as this. *See PBGC*, 712 F.3d at 709 ("[Plaintiffs], as the fiduciary administrator of an ERISA-governed plan, was in a position to plead its claims with greater factual detail than is typically accessible to plaintiffs prior to discovery.").

Similarly, Defendants attempt to contort the Supreme Court's holding in *Hughes v. Northwestern University*, that "courts must give due regard to the range of reasonable judgments a fiduciary may make", into a presumption of prudence. *Hughes*, 142 S. Ct. 737, 742 (2022) ("*Hughes I*"). However, the Supreme Court "do[es] not believe that the presumption [of prudence] is an appropriate way to weed out meritless lawsuits or to provide the requisite 'balancing.' The proposed presumption makes it impossible for a plaintiff to state a duty-of-prudence claim, no matter how meritorious." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). The court in *Bancorp* made this statement after the defendants, like Defendants here, argued that courts should lean toward dismissal because ERISA cases can be "economically burdensome" on defendants. *Id. at* 424; *see also* Defs. Br. at 20-21 (arguing the same). Nonetheless, "the concern 'that putting employers to the work of persuading factfinders that their choices are reasonable makes it harder and costlier to defend ... ha[s] to be directed at Congress, which set the balance where it is." *Bugielski v. AT&T Servs., Inc.*, 76 F.4th 894, 907 (9th Cir. 2023) (citations omitted).

Moreover, the Supreme Court and the Seventh Circuit in *Hughes* upheld allegations that are nearly identical to the instant allegations, particularly Plaintiffs' service-based allegations. *See Hughes I*, 142 S. Ct. at 741-42; *Hughes v. Northwestern Univ.,* 63 F.4th 615, 632 (7th Cir. 2023) ("*Hughes II*") (alleging that the asset-based structure was imprudent, and "that recordkeeping services are fungible and that the market for them is highly competitive").[1] Directly applicable here is *Hughes I*'s holding that courts must regard the "context-specific inquiry that ERISA requires" and "[]evaluate the allegations as a whole [...] [b]ecause the content of the duty of prudence turns on 'the circumstances ... prevailing' at the time the fiduciary acts." *Hughes I*, 142 S. Ct. at 740, 742. At the time Defendants were tasked with evaluating Plan fees, the circumstances of the marketplace and the Plan's fee history plausibly indicate that Defendants failed to conduct a prudent investigation regarding fees.

Defendants' incorrect interpretation of the facts is equally unavailing and inappropriate at this stage. Defendants improperly attack each allegation separately, rather than acknowledging the interplay between allegations that create the

---

[1] Defendants argue that *Hughes II* was distinguishable because "the key allegation" was the fiduciary's failure to consolidate recordkeepers. Defs. Br. at 34. "Consolidation, however, was not determinative in *Hughes II*. Indeed, the court explicitly said that the recordkeeping claim was 'not limited to a failure to consolidate recordkeepers.'" *Glick v. ThedaCare, Inc.*, No. 20-cv-1236, 2023 WL 9327209, *6 (E.D. Wis. July 20, 2023) (quoting *Hughes II*, 63 F.4th at 633).

inferences of imprudence. *See Sacerdote*, 9 F.4th at 109n.49 ("ERISA's 'remedial scheme ... counsel[s] careful and holistic evaluation of an ERISA complaint's factual allegations.'") (*quoting Braden v. Wal-Mart Stores*, 588 F.3d 585, 598 (8th Cir. 2009)). Defendants ignore how the Plan's fees continuously increased while the services and basis points ("bps") for assessing fees remained the same and the marketplace was highly competitive. Nonetheless, applying the proper plausibility standard to the context specific allegations made by Plaintiffs in this case warrants reversal.

## II.     The Plan's Fee History Demonstrates Imprudent Conduct

The consequences of using an asset-based structure for the Plan plausibly alleges that Defendants were using an imprudent process to investigate the Plan's fees, and that the Plan's fees were excessive in relation to the services rendered. *See, e.g., Mator v. Wesco Distribution, Inc.,* 102 F.4th 172, 179 (3d Cir. 2024) (the challenged fee structure was imprudent because it led to an increase in fees "just because participants have contributed more to their accounts or the market has gone up", while services remain the same); *Ramos v. Banner Health*, 1 F.4th 769, 775 (10th Cir. 2021) ("While uncapped, revenue-sharing arrangements are not unheard of in compensating service providers, they are much less common than flat, per-participant fees—agreements in which the compensation does not fluctuate based on the value of the assets in a plan."); *Kistler v. Stanley Black & Decker, Inc.*, No. 22-

cv-966, 2024 WL 3292543, at *20 (D. Conn. July 3, 2024) ("The plaintiffs' claim of excessive RK&A fees is additionally plausible because the plaintiffs allege that the Plan's per-participant RK&A fees did not reduce as the Plan itself grew."); *Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, No. 21-cv-8384, 2024 WL 2815980, at *9 (S.D.N.Y. May 31, 2024) ("the increase in revenue, coupled with the fact that [it] allegedly provided little benefit to the plans themselves, [] also supports a pleading-stage inference that the fees were excessive"). With every bps setting, the Plan experienced increases in fees without any changes in the level of services. APP286. When the bps remained at .00073 under the first services agreement, the amount paid increased by $801,497, and the per-participant average increased from $43-$46, but the services remained the same. *Id*. Under the lowered bps, .00037, the fees increased **four years in a row**, from $34-63, while the services remained the same. *Id*. The initial decrease in fees was also influenced by a decrease in Plan assets, but the assets subsequently increased. *Id*. Again in 2022, Defendants reduced the bps by a mere 0.00008, instead of switching to a participant-based structure. *Id*. Outside of the Plan's own fee history, marketplace data proved that plans with the same recordkeeper and size were paying less than the Plan. Plausibly, other fiduciaries successfully achieved lower fees without using the same structure as Defendants. The court in *Ruilova v. Yale-New Haven Hosp., Inc.* correctly viewed similar allegations holistically, and held that:

> At this stage, Plaintiffs' RK & A fee and service comparisons — when *combined with other facts about the market* for RK & A services and the RK & A fee bid process — are enough to support a reasonable inference that Defendants' choice to retain Fidelity as the RK & A service provider — *or their failure to use their leverage to negotiate lower fees with Fidelity* — was the result of an imprudent process and outside of the range of reasonable judgments a fiduciary may make.

No. 22-cv-00111, 2023 WL 2301962, at **17-18 (D. Conn. Mar. 1, 2023) (emphasis added).

Defendants criticize the TAC for using an "'average' figure [that] says next to nothing about how many participants actually paid how much in fees." Defs Br. at 26. However, the TAC alleges, and Defendants do not dispute, that the Plan paid an asset-based fee that took a percentage from each participant's account and the fees increased while the bps remained the same without any upgrade in services. *See id*. This means that participants paid more for the same services just by stowing more money in their account, although many services are fixed plan-wide costs. *See* APP292; *see also Mator*, 102 F.4th at 179; *Ramos*, 1 F.4th at 775. Had Defendants paid attention to the Plan's fees from 2016-2017, and calculated how much the Plan was actually paying Fidelity, they would not have elected to repeat the same asset-based phenomenon in 2018, nor would they have continued to let the fees paid from 2018-2021 go uninvestigated, because the fees predictably increased due to the Plan's assets rather than changes in service. Critically, "[a]n ERISA fiduciary's investment decisions also must account for changed circumstances, and '[a] trustee

who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.'" *PBGC*, 712 F.3d at 717 (quoting *Armstrong v. LaSalle Bank Nat'l Assoc.,* 446 F.3d 728, 734 (7th Cir. 2006)). Even if the two instances of bps decreases were the result of a negotiation, Defendants could not have been prudently informed or ardent in advocating for the Plan. *See, e.g.*, *In re Unisys Sav. Plan Litigation*, 74 F.3d 420, 436 (3d Cir. 1996) ("A reasonable factfinder could also conclude that Unisys passively accepted its consultant's positive appraisal of Executive Life without conducting the independent investigation that ERISA requires."); *Vellali v. Yale University*, 308 F. Supp. 3d 673, 686 (D. Conn. 2018) ("the question of whether the defendants did in fact reasonably weigh the benefits and burdens when selecting retail shares over institutional shares is more appropriately taken up at the summary judgment stage"); *Ruilova*, 2023 WL 2301962, at *4 (upholding allegations that the defendants either conducted "virtually no examination, comparison, or benchmarking […] or they were complicit in paying grossly excessive fees.'"); *Carfora*, 2024 WL 2815980, at *8 ("TIAA's significant increase in revenues, [… is] circumstantial evidence that Plan Sponsors must have breached their duty to monitor TIAA's compensation, either by not detecting this substantial source of indirect income, or by detecting and not renegotiating their contracts with TIAA.").

Defendants rely on the materially distinguishable case of *Matney v. Barrick Gold of North America*, 80 F.4th 1136 (10th Cir. 2023) to defend against the TAC's imprudent fiduciary process allegations. Defs. Br. at 27. However, the plan in *Matney* used a "flat" fee structure with Fidelity (the same recordkeeper for the Plan), thus the fees truly "became cheaper over time", unlike here, where the lower bps only gave the illusion of a decrease. *Matney*, 80 F.4th at 1156. Hence, *Matney* proves Plaintiffs' arguments that Fidelity could have provided a flat fee structure that would have led to actual fee decreases. *Matney* also poignantly held that the RFP allegations did "not raise a plausible inference of imprudence ***in this case***"' (*Id.* at 1156; emphasis added) whereas most other courts have held differently. *See*, *e.g.*, *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 286 (S.D.N.Y. 2018) ("competitive bidding is not *per se* required under ERISA, but it can be an example of an action taken to ensure fees are appropriate."); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798-99 (7th Cir. 2011) (the expert opined that "that defendants' failure to solicit bids caused them to overpay Hewitt by at least $16 per participant per year. A reasonable trier of fact could" agree.); *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 137 (D. Mass. 2021) (upholding duty of prudence allegations because "[a]s part of the 'prudent man standard' one would expect a fiduciary to obtain bids at some point[.]"); *Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1106 (D. Colo. 2020), *aff'd*, 1 F.4th 769 (10th Cir. 2021) (although ERISA does not

require RFPs, the defendants "failed to monitor the reasonableness of recordkeeping fees paid to Fidelity under the uncapped, asset-based, revenue sharing agreement" and "never assessed the reasonableness of fees using any form of a competitive bid process, RFP or otherwise."). Lastly, in *Matney*, like here, the defendants took issue with the plaintiffs' allegations that "fees should *decrease* as a plan increases in size." *Matney*, 80 F.4th at 1157 n.18 (emphasis in original). The Tenth Circuit disagreed, because in viewing the facts in plaintiffs favor, "we accept the allegation that administrative fees should decrease as a Plan size increases." *Id.* Likewise, "Courts in this [Second] Circuit have consistently found that allegations of this kind are sufficient to state a claim." *Ruilova,* 2023 WL 2301962 at *16n.3 (listing cases).

Defendants also rely on *Tussey v. Abb, Inc.*, 746 F.3d 327 (8th Cir. 2014), *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), and U.S. Department of Labor ("DOL")[2] guidance, but like *Matney*, those sources support Plaintiffs' allegations that retaining an asset-based structure was not a reasonable choice in light of the Plan's circumstances. Although the Eighth Circuit in *Tussey* noted that asset-based structures are acceptable (Defs. Br. at 44), the opinion ultimately upheld the bench trial finding that the asset-based structure was *imprudent* under the circumstances of

---

[2] Defendants also cite *Divane v. Northwestern University*, 953 F.3d 980 (7th Cir. 2020). Defs. Br. at 45. But in *Divane* "the district court had granted dismissal of the complaint after more than one year of discovery." *Savage v. Sutherland Glob. Servs., Inc.*, 521 F. Supp. 3d 308, 317 (W.D.N.Y. 2021).

9

that plan (where Fidelity was also the recordkeeper). *See Tussey*, 746 F.3d at 332. Defendants also cite the Seventh Circuit's 2011 case of *Loomis v. Exelon Corp.*, but that case has since been abrogated by the Seventh Circuit. *See Hughes II,* 63 F.4th at 625 (*Loomis*' holding that asset-based structures are permissible "does not foreclose the possibility of violating a fiduciary duty by failing to monitor and incur only reasonable expenses.") (citing *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)). Indeed, switching "to a per capita expense model may in some cases be a proper means of reining in excessive expenses." *Hughes II*, 63 F.4th at 625. Lastly, Defendants artfully snip the DOL's guidance in their favor. *See* Defs. Br. at 7-8 (quoting Field Assistance Bulletin No. 2003-03, DOL (May 19, 2003) ("FAB 2003-03")). The rest of the DOL quote states:

> **A per capita method** of allocating expenses among individual accounts (*i.e.*, expenses charged equally to each account, without regard to assets in the individual account) **may also provide a reasonable method of allocating certain fixed administrative expenses of the plan, such as recordkeeping, legal, auditing, annual reporting, claims processing and similar administrative expenses**.

FAB 2003-03. Indeed, these are the exact fixed expenses that the TAC alleges can be purchased for a lower price by using a per-participant structure. *See* APP275-77. Notably, FAB 2003-03 is over twenty years old, and asset-based structure are currently "much less common than flat, per-participant fees." *Ramos*, 1 F.4th at 775 (issued in 2021). Ultimately, "ERISA does not require a per-capita fee structure,

[but] it does require that a fiduciary ensure that 'fees paid to recordkeepers are not excessive relative to services rendered.'" *Vellali v. Yale Univ.*, No. 16-cv-1345, 2022 WL 13684612, at *10 (D. Conn. Oct. 21, 2022) (quoting *Sacerdote*, 328 F.Supp.3d at 286). Indeed "there is a disputed issue of fact as to whether or not [the recordkeeper] received 'extra compensation without providing any additional services beyond those which it [was] contractually obligated to perform for [set] basis points.'" *Sandoval v. Exela Enter. Sols., Inc.*, No. 17-cv-1573, 2020 WL 9259108, at *8 (D. Conn. Mar. 30, 2020). This factual dispute is premature at this stage. *Id*.

Switching from an asset-based structure to a participant-based structure is prudent in order to get the same services for lower costs. Conversely, it was not prudent for Defendants to merely lower the bps after evidence showed that the asset-based structure only led to fee increases for the same services. ERISA claims survive a motion to dismiss "if the complaint allege[s] facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *PBGC*, 712 F.3d at 718. Defendants did not investigate the Plan's fees or the market.

Defendants list "reasons why administrators might select an asset-based fee allocation," but that does not mean Defendants here kept the asset-based fees for those reasons, or that those reasons were prudent under the prevailing circumstances.

Defs. Br. at 44. Nor is it appropriate to assume that "richer investors [] are more likely to utilize customer-support services" than novice investors with smaller balances and less experience. *Id*. Defendants' hypothetical arguments for why they may have kept the asset-based structure do not address the increases in fees for the same services, are purely speculative, and less plausible than the imprudent processes alleged by Plaintiffs. Nonetheless, the Parties' dispute about Defendants' justifications are factual and thus are inappropriate to consider at this stage. *See, e.g., Davis v. Salesforce.com, Inc.*, No. 21-cv-15867, 2022 WL 1055557, *2 (9th Cir. Apr. 8, 2022) (an ERISA case holding that whether the defendants' reasons actually "justified defendants' delay in making the switch earlier is itself a factual issue that cannot be resolved at the pleading stage."); *Sacerdote*, 9 F.4th at 108; *Hughes II*, 63 F.4th at 633; *Mator*, 102 F.4th at 184.

## III. Plaintiffs' Services Allegations

Defendants mischaracterize Plaintiffs' arguments as stating that services do "not vary in terms of the scope or quality offered." Defs. Br. at 36. Plaintiffs actually allege that the price is set "regardless of the services chosen or utilized by the plan" and "[t]he services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services." APP277. Both the district court and Defendants ignore the well pled allegation that the services chosen by plans do not change a recordkeeper's bottom line because recordkeepers "invest in

technology infrastructure necessary to provide recordkeeping and transaction services to all clients." APP277. Because the technology performs the tasks, and because so many services are mandatory compliance tasks uniformly imposed on all plans, the only thing left for recordkeepers to compete over is price. *See* APP275 (listing "IRS Form 1099-R", "IRS Form 5500", "standard notices", "operational compliance support" as services).

Plus, the TAC alleges a range of reasonable fees, $25-$30, "by looking at the following factors: [… including] the record keeping and administrative services available and utilized for plans of the size of the comparator and Montefiore Plan, the participant services available and utilized for plans of the size of the comparator and Montefiore Plan, and the reputation of the record keepers." APP287. The TAC does not foreclose the possibly that even fungible services may cause reasonable fees to be more or less within that $5 range, but nonetheless, size is the driving factor in pricing. *See* APP277; APP287. Relatedly, allocating the fixed cost over a large pool of participants is more prudent than using an asset-based structure when the same services can be purchased for cheaper. *See* FAB 2003-03. Defendants reiterate the district court's incorrect holding that "[t]he plaintiffs thus had 'failed to allege with specificity what recordkeeping services the Plan received, [and to] plead that the services provided by the recordkeepers for the comparator plans were the same as those provided by the Plan's recordkeepers." Defs. Br. at 11. Both Defendants

and the district court conflate relativity with specificity. In ruling on similar complaints, many courts have held that alleging that services are "fungible" adequately accounts for the fees in "relation to the services provided." *Hughes II*, 63 F.4th at 632; *see also Kruchten v. Ricoh USA, Inc.*, No. 23-cv-1928, 2024 WL 3518308, **2-3 (3d Cir. July 24, 2024); *Perkins v. United Surgical Partners*, No. 23-cv-10375, 2024 WL 1574342, at *4 (5th Cir. Apr. 11, 2024); *Mator*, 102 F.4th at 187; *Braden*, 588 F.3d at 601n.9; *Dionicio v. U.S. Bancorp*, No. 23-cv-0026, 2024 WL 1216519, at *5 (D. Minn. Mar. 21, 2024) ("Although no clear consensus has emerged, the majority of judges addressing specific allegations regarding the fungibility and commodification of recordkeeping services have found the excessive-fees claims to be plausible.").

Both the district court and Defendants incorrectly state that the Plan's fee agreements "showed that the Plan selected and paid for a number of individualized services not included in the standard bundle of services recordkeepers provide" (Defs. Br. 17), and the Plan paid for "optional" services. *Id*. at 14. Not so. First, the earlier Principal Agreement explicitly states that the .073% bps pertains to the "fees for core services", while the following pages of the agreement (citing in Defs. Br. at 40) is a separate menu of *potential* future add-on options with pricing scenarios. *See* Document 62-2. Thus, even if the Plan purchased those items separately (which is presently unknown) it would not affect the allegations relating to fees and core

services. Second, the Fidelity Agreement's (the "Agreement") list of services all fit squarely within the essential services listed in the TAC, albeit the Agreement uses more details than the short and plain statement in the TAC. Compare, Dkt. 62-1, 21-24 with APP275-76. Indeed, the title of the Agreement is "Description of Services" not "additional services", therefore it does not state that they are add-ons or that there was any additional costs.[3] Document 62-1, 21-24; *see also* APP276 (alleging that the Agreement's "services are all standard services for account recordkeeping, participant access to their accounts, transaction accounting, payroll services, tax reporting services, account statements, financial reporting, participant education and plan consulting for operational materials and compliance."). For example, the Agreement states that "Fidelity will provide the recordkeeping and administrative services" which is the literal definition of recordkeeping and would not be considered an add-on in a recordkeeping contract. *Id*. To list just a few other examples of many: (1) the TAC lists "Multi-channel participant and plan sponsor access (e.g. phone, web)" (APP275) which matches the Agreement's "telephone service" available during business hours and "on-line account access." (Dk. 62-1,

---

[3] If there is ambiguity in the terms of the Agreement, then discovery is required to resolve the dispute. "[T]he trier of fact must resolve any ambiguities in an ERISA contract identified by the court and incapable of definitive resolution on the existing record." *Parmenter v. Prudential Ins. Co. of Am.*, 93 F.4th 13, 24 (1st Cir. 2024) (internal citations omitted); *see also Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016) (courts "constru[e] any ambiguities "in the light most favorable to upholding the plaintiff's claim.").

at21); (2) the TAC lists "Payroll service (hardships, in-service withdrawals, termination distributions)" (APP275) matching the Agreement's, "process consolidated payroll contributions" and "process in-service withdrawals, hardship withdrawal" and "full distributions." Dk. 62-1, at 20; and (3) the TAC lists "Daily participant transaction accounting (*e.g.,* purchases, redemptions, exchanges)" and "Plan-level reporting" (APP275), like the Agreement lists "daily Plan-and-Participant-level accounting for all Plan investment options." Dk. 62-1, p. 20. It was impermissible for the district court to assume these services differed, particularly in light of the well pled allegations that "[t]here are essential recordkeeping services provided by all national recordkeepers for large plans[,]" and "a review of the Plan's recordkeeping agreements" revealed that the recordkeepers were "not providing any services beyond the standard services listed above in exchange for their asset based RKA fees." APP275-76. It is implausible that other plans take care of these essential recordkeeping-related tasks with another third party rather than include it with their RKA fee bundle. For example, it is implausible that the other plans' recordkeepers did not offer the same 24-hour on "on-line account access via the world wide web," (Defs. Br. at 40) and would not "allow participants to make address changes[,]" (62-1 at 22) or that it was prudent for the Plan to pay extra for this access.

In sum, the Court impermissibly assumed that the Plan's high fees were indisputably due to extra services where the list of Plan services were

overwhelmingly similar to the Plan's fee agreements, apart from the levels of description. As the TAC alleges, Plaintiffs made sure the service codes were "consistent" with the Montefiore analysis and kept the comparator plans' "fees analyzed to solely RKA fees." APP288. *See also Mator*, 2024 WL 2198120 at *7 ("The different service codes do not undermine the Mators' comparisons because they apparently overlap."), *Ricoh*, 2024 WL 3518308 at *3, *Perkins*, 2024 WL 1574342 at *4n.6. Moreover, because the TAC should be read holistically (*Hughes I*, 142 S. Ct. at 742), the fact that the services justified the fees is even less plausible considering the Plan's fees increased without any change in services under the Plan's asset-based structure. *See*, *e.g.*, *Moore v. Humana, Inc.*, No. 21-cv-232, 2022 WL 20766504, at *3 (W.D. Ky. Dec. 2, 2022) ("Defendants do not argue, nor would it make sense to argue, that the Plan offered dissimilar services compared to itself."); *Mator*, 102 F.4th at 179; *Ramos*, 1 F.4th at 775.

Defendants' cases are distinguishable. In particular, *Cunningham* was a summary judgment case, meaning similar allegations survived the motion to dismiss. *See Mulligan v. Long Island Univ.,* No. 18-cv-2885, 2018 WL 8014320, at *3 (E.D.N.Y. Dec. 13, 2018) (*Cunningham* "proceeded to discovery [and] suggests that in this case discovery should also proceed, because the case is not resolvable on the pleadings."). The allegations that survived the pleadings stage in *Cunningham* were, like here, that the defendants breaches included "failing to monitor and control the

Plans' recordkeeping fees by (a) failing to monitor the amount of revenue sharing received by the Plans' recordkeepers, (b) failing to determine if the amount of revenue sharing paid to the recordkeepers was competitive or reasonable, and (c) failing to use the Plans' size to reduce fees…" *Cunningham v. Cornell Univ.*, No. 16-cv-6525, 2017 WL 4358769, at *5–6 (S.D.N.Y. Sept. 29, 2017), *aff'd*, 86 F.4th 961 (2d Cir. 2023). Plus, the instant allegations would still pass summary judgment under the Second Circuit's *Cunningham* opinion which upheld the district court's finding "that material issues of fact remained as to whether the Cornell Defendants breached their duty of prudence." *Cunningham*, 86 F.4th at 972. However, summary judgment was granted because once the plaintiffs' experts were excluded, they could not prove loss. *Id.* at 982.

Defendants also point to the Eighth Circuit decision in *Barrett v. O'Reilly Auto., Inc.*, 112 F.4th 1135 (8th Cir. 2024)*,* but the *dicta* in *Barrett* supports finding plausibility here for several reasons. First, the extra services found to be too different in *Barrett* were "investment-management and trustee fees," not recordkeeping services, and not the same recordkeeping services all plans utilize. *Barrett*, 112 F.4th at 1139. Relatedly, that complaint did not "try to explain why they were similar." *Id.* at 1140. Second, the court in *Barrett* also agreed with the Third Circuit in *Mator*, which upheld similar service-code based allegations as the instant case, because "'the services purchased were sufficiently similar to render the comparisons valid.'"

*Id.* (quoting *Mator*, 102 F.4th at 188). Third, in *Barrett*, the court distinguished the allegations in that case from the asset-based findings of imprudence upheld in *Tussey*, *see Barrett,* 112 F.4th at 1138, implying that the instant circumstances are also distinguishable. *Tussey*, *Mator*, and other Circuit opinions are more relevant here than *Barrett*, because *Barrett* did not involve asset-based fee allegations. Lastly, the Plan's fees and services compared to itself are meaningful, unlike the "two grocery baskets with different items" representing comparator plans in *Barrett*, 112 F.4th at 1139. Thus, the services of the Plan and comparator plans are sufficiently similar.

## IV. Plaintiffs Allege Meaningful Comparators

### A. The Plans

Defendants recite the district court's incorrect finding that "the TAC 'offer[ed] no alternative plan that has a comparable number of participants **_or_** assets under management as the Plan." Defs. Br. at 14 (quoting App. 027) (emphasis added). To the contrary, the TAC includes plans similar in size of assets and/or participants. *See* Plaintiffs' Opening Br. at 39-40. These plans prove size is the driving factor and demonstrate that plans with the same or more assets paid less in fees (*see* APP288). This disproves Defendants' speculation that it could be prudent for large plans to pay asset-based fees, or at least disproves that Defendants prudently negotiated a lower bps that was in line with market rates. *See* Defs. Br. at

44-45. Moreover, all three of the plans with more assets than the Plan paid lower fees in 2021. APP288. Whether you look at plans with similar participant counts or assets as the Plan, they consistently achieved lower fees than the Plan while receiving similar services.

Defendants' attack on the TAC's specific plan comparators ignores that the TAC alleges a reasonable fee *range*, and some of the comparator plans are included to show that asset-based fees are imprudent in plans with large assets. First, Defendants' scatter plot zooms in to give the appearance that there is a vast difference in fee points, but the scatterplot shows that the largest plan paid the lowest fees, and the smallest plan paid only $1 less than the lowest paying plan. Defs. Br. at 38. If Defendants' overly simplistic scatterplot properly included the Plan it would show that the Plan paid more than the six plans with larger participant sizes. Also missing from the scatterplot are the second chart's smaller plans paying more in fees than the larger comparator plans, which proves Plaintiffs' size-based allegations. Viewed holistically (*Hughes*, 142 S. Ct. at 742), these combined allegations prove that size is the driving factor in pricing. Even if Defendants' scatterplot was reliable (it is not), it would be best reserved for later stages.[4]

---

[4] Defendants support their use of the scatterplot with two Non-ERISA opinions, involving trial experts. *See* Defs. Br. at 38-39 (citing *Barnett v. City of Chicago*, 969 F. Supp. 1359 (N.D. Ill. 1997); *N.A.A.C.P. v. City of Niagara Falls, N.Y*, 65 F.3d 1002 (2d Cir. 1995)).

Second, Defendants' plan specific criticisms are incorrect. Defendants argue that the Deseret plan has "nearly 35,000 participants" (Defs. Br. at 37) when it is actually closer to 34,000 participants (34,357) and has similar assets to the Plan. APP288. On the other hand, the JBS Plan, criticized by Defendants, had a close number of participants to the Plan. *Id*. Both plans paid lower fees. If we applied the Plan's bps to the Deseret's plan's assets and divided it among that plan's participant count, the Deseret plan would have an average fee of $36.42 per-participant instead of a $25 fee,[5] so either Deseret was using a flat fee or a lower bps. This disproves Defendants' argument that "the TAC contains no allegations addressing whether the comparator plans use an asset-based or a participant-based fee distribution mechanism." Defs. Br. at 43. Looking at the plans with similar assets and lower per-participant fees indicates that the comparators were not using an asset-based structure. Moreover, all plans' fees are "are derived, in the same manner as for Montefiore […] which keeps the fees analyzed to solely RKA fees." APP288. Defendants' argument is also irrelevant because the district court did not hold that Plaintiffs' must allege the plans' fee structures and Defendants provide no other legal support for this argument. Indeed, "a claim alleging a breach of fiduciary duty may still survive a motion to dismiss if the court, based on circumstantial factual

---

[5] $3,381,868,127 \times 0.00037 = \$1,251,291.20699/34,357$ participants$= \$36.42$.

allegations, may reasonably infer from what is alleged that the process was flawed." *PBGC*, 712 F.3d at 718.

Fourth, Defendants argue that the Fidelity recordkept plan of General Dynamics is less than 14% larger than the Fidelity recordkept plan of Publicis Benefits Connection, but paid "slightly more" in fees. Defs. Br. at 37. This does not undermine Plaintiffs' allegations because the roughly 10% difference is squarely within the broader range Plaintiffs allege is a reasonable fee. *See Supra*, at p.13. Both plans paid less than half of what the Plan paid even though General Dynamics had three times the assets as the Plan, and Publicis had 65% of the assets of the Plan.

### B. Fidelity's Stipulation is Relevant

Defendants argue that the Fidelity Stipulation is unreliable because it involved "different parties, concerning a different plan," but all relevant caselaw involves different parties and plans, and thus also "different facts." Defs. Br. at 47. Although some courts have found the Stipulation alone is insufficient, other published opinions have upheld the Stipulation when, like here, Fidelity is the challenged plan's recordkeeper and/or there are accompanying allegations involving specific plans. *See*, *e.g.*, *Garnick v. Wake Forest Univ. Baptist Med. Ctr.*, 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022); *Teodosio v. DaVita, Inc.*, 684 F. Supp. 3d 1117, 1127 (D. Colo. 2023); *McDonald v. Lab'y Corp. of Am. Holdings*, No. 22-cv-680, 2023 WL 4850693, at *6 (M.D.N.C. July 28, 2023); *Stengl v. L3Harris Techs., Inc.*, No.

22-cv-572, 2023 WL 2633333, at *5 (M.D. Fla. Mar. 24, 2023). Since Plaintiffs' Opening Brief was filed, the Stipulation was again upheld. *See Dukes v. AmerisourceBergen Corp.*, 23-cv-313, slip op. (W.D. Ky. Sep. 24, 2024). Like here, the defendants in *Dukes* argued that "the Court must ignore [the stipulation] because 'Fidelity has since clarified the stipulation[,]'" and cited to the same cases Defendants here cite. *Id*. at 3n.3. The court held that "[n]one of the authorities cited by Defendants are binding on the Court, and in any event, this argument is not properly considered at the motion-to-dismiss stage, where the well-pleaded allegations in Plaintiffs' complaint must be taken as true and all inferences must be drawn in the plaintiffs' favor." *Id*. Like here, the recordkeeper in *Dukes* was Fidelity and Defendants cases are out-of-Circuit. Further, Defendants try to discredit the Stipulation because that plan's assets were higher than the Plan (Defs. Br. at 28), but the Stipulation explicitly states that, per Fidelity, the tiering for plans is defined as "at least $1 billion in assets." APP291. Lastly, if Fidelity's pricing was driven by service instead of size, then why did Fidelity focus its quote on the plan's size and not the caliber of its services? *Id*.

## C.    The TAC's Amendments

Defendants' focus on changes between the SAC and TAC are unavailing. The purpose of an amended complaint is to *amend* the complaint to enhance plausibility. Further, the district court did not humor Defendants' arguments that Plaintiffs'

changes were in bad faith. Defendants accuse Plaintiffs of providing a "new list" of comparator plans. Defs. Br. at 13. Not so. Both the TAC and SAC cite the same five plans that are similar to the size of the Plan. Compare APP288 with APP056 (specifically, The FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan, JBS 401(k) Savings Plan, Deseret 401(k) Plan, Publicis Benefits Connection 401K Plan, and the Kaiser Permanente Supplemental Savings and Retirement Plan). These comparators remained the same after the TAC corrected the SAC's calculations. Although five would be enough (*Mator*, 102 F.4th at 187), the TAC adds three more size comparable plans, totaling eight before reaching the chart of smaller plans paying less. In any event, the TAC is the complaint under scrutiny now, and the district court did not criticize the minor changes in comparator plans. Likewise, the district court never found that Defendants' interpretation of the NEPC survey in the SAC was correct (Defs. Br. at 31), nor that the TAC impermissibly deleted this paragraph. Courts have found that allegations regarding charts of comparator plans are more plausible than published averages, thus there is nothing nefarious about deleting averages. *See Mator*, 102 F.4th at 188. The TAC and the district court's holding are at issue here, making Defendants' SAC related arguments irrelevant.

## V.  Plaintiff Jiminez Has Sufficiently Alleged Standing

As a threshold matter, Defendants' arguments regarding Plaintiff Jiminez are based on their flawed premise that "reasonableness is a *legal* standard." Defs. Br. at 33 (emphasis in original). Actually, "[w]hether compensation is 'reasonable' ... depends on the particular facts and circumstances of each case." *Nat'l Ass'n for Fixed Annuities v. Perez*, 217 F. Supp. 3d 1, 45 (D.D.C. 2016); *see also Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018) ("'[t]he question whether it was imprudent to pay a particular amount of record-keeping fees generally involves questions of fact that cannot be resolved on a motion to dismiss.'"); *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018) (same).

The district court held that the allegations that the "Jiminez was charged an unreasonable fee of $31 per year satisfies the jurisdictional requirement at this stage of litigation." SA012. Indeed, "[a]ny amount lost because of a bad decision has repercussions for the participant such that it could be cognizable as an injury-in-fact." *In re Omnicom ERISA Litig.*, No. 20-cv-4141, 2021 WL 3292487, at *7 (S.D.N.Y. Aug. 2, 2021). Plaintiffs agree with the district court's holding that Jimenez suffered an injury-in-fact. Defendants improperly re-attempt their standing arguments and should be rejected. Defendants admit that Jimenez paid above the alleged reasonable range, however, Defendants argue the amount she overpaid "is not so great that it suggests imprudence[,]" (Defs. Br. at 30) but this is a question of damages not injury. *See Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502

F.3d 91, 107 (2d Cir. 2007) ("the extent of the difference between the but-for fee and the actual fee paid is relevant to the question of damages."); *LaScala v. Scrufari*, 479 F.3d 213, 221 (2d Cir.2007) ("The fact that the [pension funds] may not have suffered any loss as a result of [fiduciary breaches] may bear on the question of damages, but has no bearing on whether [he] breached his fiduciary duties in the first place.").

Furthermore, Defendants ignore that under an asset-based structure, Jiminez's fees increased as she contributed more into her account while receiving the same services. Jiminez could have experienced decreases as the Plan's participant counts increased, rather than a decrease under the unfortunate circumstances of lessening her account balance. Defendants attempt to argue that the General Dynamics plan paid $31 to Fidelity in 2021 (what Jiminez paid in 2018). *See* Defs. Br. at 29. Yet, that plan's participants would not have experienced an increase in fees in 2019, like the Plan, just because participants like Jiminez saved more in their accounts. *See*, *e.g.*, *Mator*, 102 F.4th at 179; *Ramos*, 1 F.4th at 775. Defendants' footnote argues that "common sense suggests that Jiminez's account balance has not sat statically at $85,000 each year—leaving the impression that the $31 fee alleged for 2018 was the most that Jiminez paid." Defs. Br. at 29n.2. Common sense would lead to the opposite conclusion – either Jiminez saved more or accrued more, therefore her fees would have increased. Jiminez suffered an injury-in-fact.

## VI. Duty to monitor

Defendants agree that "the failure to monitor claim is derivative of the duty of prudence claim." Defs. Br. at 49. Because Plaintiffs' duty of prudence claim is plausibly alleged, the duty to monitor claim is also plausibly alleged.

## CONCLUSION

For the forgoing reasons, Plaintiffs-Appellants respectfully request the Court reverse the District Court's decision to deny Plaintiffs' Motion to Amend the Complaint and direct the case be reopened for further proceedings on the merits.

Dated: October 2, 2024

Respectfully submitted,

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh
CAPOZZI ADLER, P.C.
312 Old Lancaster Road
Merion Station, PA 19066
Telephone: (610) 890-0200
Facsimile: (717) 233-4103
Email: mark@capozziadler.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      I certify that this brief complies with the provisions of Fed.R.App.P. 31(a)(4)(1), and that this brief contains 6,533 words, excluding the parts of the brief exempted by Fed.R.App.P. (32)(a)(7).

2.      I certify that this brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P 32(2)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 Word Times New Roman 14 point font.

3.  This document has been scanned for viruses and the brief is virus-free.


Dated: October 2, 2024                    */s/ Mark K. Gyandoh*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on October 2, 2024.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: October 2, 2024                    */s/ Mark K. Gyandoh*